941 A.2d 517

**STATE of Maryland**

v.

**Demetrius Sylvester JENKINS.**

**No. 1315 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 6, 2008.

158

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellant.

Juan P. Reyes (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellee.

Panel: DAVIS, ADKINS, JJ., and CHARLES E. MOYLAN, JR., J. (retired, specially assigned).

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

As if stripping an onion, we are here called upon to peel away layer after layer of judicial review and to lay each under a microscope. In the context of authorizing a search and seizure warrant, it is the warrant-issuing judge who first takes a set of facts, generally set forth in the application for the warrant, and assesses the warrant request for Fourth Amendment reasonableness. Looking over the shoulder of the warrant-issuing judge, however, is a suppression hearing judge. But then looking over the shoulder of the suppression hearing judge may be a trial judge, on a motion for reconsideration, or, in any event, a panel of intermediate appellate judges. Looking over their shoulders, in turn, may be the Court of Appeals, and looking over its shoulder hovers menacingly the Supreme Court of the United States. The criteria to be invoked as one judge looks over the shoulder of another, moreover, may shift as we move up or down the totem pole of judicial review. Highly pertinent is the sage perspective of Ogden Nash:

Even fleas have little fleas,
On their backs to bite 'em.
And those fleas have littler fleas,
And so *ad infinitum.*

### A State Appeal

A criminal information filed by the State's Attorney for Talbot County charged the appellee, Demetrius Sylvester Jenkins, with the possession of cocaine and related charges. The appellee moved to have the physical evidence suppressed on the ground that its seizure had been in violation of the Fourth Amendment. Following a hearing on that motion on July 9, 2007, the suppression hearing court, on July 17, 2007, issued an opinion and order, directing that the evidence be suppressed.

The State appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c), which provides in pertinent part:

(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

. . . .

(3)(i) In ... cases under §§ 5–602 through 5–609 and §§ 5–612 though 5–614 of the Criminal Law Article, *the State may appeal from a decision of a trial court that excludes evidence offered by the State* or requires the return of property *alleged to have been seized in violation of the Constitution of the United States,* the Constitution of Maryland, or the Maryland Declaration of Rights.

. . . .

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. *The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.*

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken.

(Emphasis supplied).

Accordingly, our decision in this case, should we have opted to reverse, had to have been filed no later than January 22, 2008. We did opt to reverse, and, in compliance with that deadline, we filed a decision on January 10, 2008, holding that the suppression order must be vacated and the case remanded for a trial on the merits, with the physical evidence being unsuppressed. We further indicated that a fuller opinion, explaining the basis for our decision, would follow. It now does.

Our ultimate holding that the physical evidence in this case should not have been suppressed is based on two very distinct analyses. The first, which we will address in Part I, is that the search warrant itself should never have been ruled to have been unconstitutional under the Fourth Amendment. The second analysis, which we will address in Part II, deals with the purely contingent alternative that the execution by the police of even a flawed warrant should not lead to the exclusion of evidence because of the "good faith exception" to exclusion articulated by *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Our conclusion in this regard is that the suppression hearing court erred in ruling that the "good faith exception" would not be available to fend off exclusion.

## Part I:
## The Warrant Itself

### A. The Issuance of the Warrant

On September 29, 2006, Corporal John F. Jones, III, of the Special Operations Unit of the Easton Police Department, presented an eight-page application for a search and seizure warrant to Judge Sidney S. Campen, Jr., of the Circuit Court for Talbot County. Judge Campen issued the warrant, which directed Corporal Jones to search the person of the appellee and to seize any controlled dangerous substances and drug paraphernalia found on his person.

On October 11, 2006, Corporal Jones and other members of the Special Operations Unit seized the appellee and executed the warrant. They recovered from his left front pants pocket a quantity of crack cocaine, broken down into rocks for sale purposes. The appellee moved to have that physical evidence suppressed, and the hearing on that motion took place on July 9, 2007. No witnesses were presented at the hearing. The hearing consisted simply of the arguments of counsel and the discussion was confined to the "four corners" of the warrant

application. The appellee's position was that the application "lacked sufficient credible and corroborated evidence for there to be probable cause for its issuance."

## B. The Standard of Judicial Review of a Search Warrant

■ Before going on to the question of the "good faith exception" to the Exclusionary Rule, the suppression hearing court determined that the warrant was invalid because the warrant application had failed to establish probable cause. Our reversal of the suppression order is based, in part, on our conclusion that the suppression court evaluated the wrong predicate and applied, therefore, the wrong standard of judicial review. We find that the suppression court made a direct ruling on the sufficiency of the warrant application itself, as if it were being called upon to issue the warrant, instead of conducting a more deferential appraisal of another judge's earlier ruling on that subject, to wit, on Judge Campen's decision to issue the warrant. The direct focus was on the warrant itself rather than on the distinct question of whether Judge Campen had some substantial basis for issuing the warrant. After making his argument about the warrant itself, appellee's counsel asked for a ruling in the following terms:

> I would ask Your Honor to hold that *there was not probable cause for this warrant to have been issued* and suppress the evidence that was obtained by the State as a result thereof.

(Emphasis supplied).

In all of the argument at the hearing, there was no mention of the "substantial basis" test. At the conclusion of the hearing, the court deferred judgment on the "good faith exception" but made a square ruling on the invalidity of the warrant itself.

> First of all that *there is no doubt about the fact that the warrant is invalid.* It does not undertake to establish the credibility of the confidential informant. It does not undertake to indicate that any more than hearsay from a person

whose veracity is not known. That's what it comes down to. *I have no hesitation about saying the warrant is not valid.* (Emphasis supplied).

As recently as *Greenstreet v. State,* 392 Md. 652, 667–68, 898 A.2d 961 (2006), Judge Harrell stressed for the Court of Appeals the critical difference between a *de novo* appraisal of a warrant itself and the more deferential appraisal of the warrant-issuing judge's decision to issue the warrant.

> We determine first whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause. *State v. Amerman,* 84 Md.App. 461, 463–64, 581 A.2d 19 (1990). *We do so not by applying a de novo standard of review, but rather a deferential one.* The task of the issuing judge is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search. *The duty of a reviewing court is to ensure that the issuing judge had a "substantial basis for . . . conclud[ing] that probable cause existed."* The U.S. Supreme Court explained in *Gates* that the purpose of this standard of review is to encourage the police to submit to the warrant process.

(Emphasis supplied). See also *Patterson v. State,* 401 Md. 76, 89–90, 930 A.2d 348 (2007), as it quoted with approval that discussion of the appropriate standard of judicial review.

The precise section of *State v. Amerman,* 84 Md.App. 461, 463–64, 581 A.2d 19 (1990), to which Judge Harrell made approving reference, made it clear that the more deferential substantial-basis standard governed judicial review generally, *nisi prius* suppression hearing courts and appellate courts alike.

> The controlling principle dictating this reversal of a suppression order is that *when a judge, either at a pretrial suppression hearing or at trial, sits in review of another judge's earlier determination that probable cause existed* to issue a search and seizure warrant (or an arrest warrant),

*the reviewing judge sits in an appellate-like capacity* with all of the attendant appellate constraints. Although he may ordinarily be accustomed to assessing probable cause as a matter of fact, he is in this less characteristic role called upon to assess it as a matter of law. *The issue is no longer the familiar one of whether probable cause exists; that has already been determined by someone else.* The distinct issue, at the reviewing level, is whether that earlier decision now being reviewed was or was not legally in error.

. . . .

Under the circumstances, it is perfectly logical and not at all unexpected that a suppression hearing judge might say, "*I myself would not find probable cause* from these circumstances; *but that is immaterial. I cannot say that the warrant-issuing judge* who did find probable cause from them *lacked a substantial basis to do so; and that is material.*" There is a Voltairean echo, "I may disagree with what you decide but I will defend with my ruling your right to decide it."

(Emphasis supplied).

The constitutional tap-root of authority for the way in which the Fourth Amendment views a search warrant is *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

[W]e have repeatedly said that *after-the-fact scrutiny by courts* of the sufficiency of an affidavit *should not take the form of de novo review.* A magistrate's "determination of probable cause should be paid great deference by reviewing courts". "A grudging or negative attitude by reviewing courts towards warrants," is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner."

(Emphasis supplied).

The Supreme Court explicated that the *raison d'etre* for the special preference a warrant enjoys is that it is a practical way

to encourage the police to resort to warrants rather than to warrantless searches. The *Gates* Court explained:

> We also have said that "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants,*" *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). This reflects both *a desire to encourage use of the warrant process by police officers* and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.

462 U.S. at 236 n. 10, 103 S.Ct. 2317 (emphasis supplied). The substantial basis standard was determined by the Supreme Court to be an efficacious way of implementing the "preference for the warrant process."

> Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that *so long as the magistrate had a "substantial basis for ... conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.*

*Id.* at 236, 103 S.Ct. 2317 (emphasis supplied).

*Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), followed within the year with resounding reaffirmation. The Supreme Judicial Court of Massachusetts had ruled a search warrant invalid for the reason that, *inter alia,* the credibility of an anonymous informant had not been adequately established. 390 Mass. 562, 568–70, 458 N.E.2d 717 (1983). The Supreme Court of the United States sternly reversed:

> *The Supreme Judicial Court* also *erred* in failing to grant any deference to the decision of the Magistrate to issue a warrant. *Instead of merely deciding whether the evidence* viewed as a whole *provided a "substantial basis"* for the Magistrate's finding of probable cause, *the court conducted*

*a de novo probable-cause determination. We rejected just such after-the-fact, de novo scrutiny in Gates.* A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

Examined in light of *Gates,* Lieutenant Beland's affidavit provides a substantial basis for the issuance of the warrant.

466 U.S. at 732–33, 104 S.Ct. 2085 (emphasis supplied).

Maryland has followed suit. As this Court stated in *State v. Riley,* 147 Md.App. 113, 119, 807 A.2d 797 (2002), "Under the capricious wings of *Illinois v. Gates,* the Maryland case law on deference to warrants sprang up profusely." As early as 1984, this Court, in *Ramia v. State,* 57 Md.App. 654, 660, 471 A.2d 1064, *cert. denied,* 300 Md. 154, 476 A.2d 722 (1984), made it clear that the deferential standard of review applied to suppression hearing courts and appellate courts alike.

*Illinois v. Gates* leaves no room for doubt that *reviewing courts, at the appellate level or at the suppression hearing level, have no business second-guessing the probable cause determinations of warrant-issuing magistrates by way of de novo determinations of their own.*

(Emphasis supplied).

Chief Judge Robert C. Murphy wrote for the Court of Appeals in *Potts v. State,* 300 Md. 567, 572, 479 A.2d 1335 (1984), in confirming the deferential standard of review in appraising search warrants:

*After-the-fact judicial scrutiny of the affidavit should not take the form of de novo review;* [a] magistrate's "determination of probable cause should be paid great deference by reviewing courts." [A] grudging attitude toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

(Emphasis supplied). See also *Valdez v. State,* 300 Md. 160, 169–70, 476 A.2d 1162 (1984) (noting that Maryland will not construe warrants in a hypertechnical manner, but instead will give them the benefit of the doubt); *Malcolm v. State,* 314 Md. 221, 229, 550 A.2d 670 (1988) ("As the key protection from

unreasonable government searches, warrants continue to be favored at law.").

In *Birchead v. State*, 317 Md. 691, 701, 566 A.2d 488 (1989), it was again Chief Judge Murphy who wrote for the Court of Appeals.

> *Our review* of the judge's decision to issue the search warrants *is limited to whether there was a substantial basis for concluding that the evidence sought would be discovered in the place described* in the application for the warrant. Moreover, we generally pay great deference to a magistrate's determination of probable cause.

(Emphasis supplied). See also *McDonald v. State*, 347 Md. 452, 467, 701 A.2d 675 (1997) ("We review the judge's ... decision to issue a search warrant to determine whether there was 'a substantial basis for concluding that the evidence ... would be discovered in the place described in the application.'"); *State v. Coley*, 145 Md.App. 502, 521, 805 A.2d 1186 (2002) (*"The substantial basis standard involves 'something less than* finding the existence of *probable cause.'"* (Emphasis supplied)); *Braxton v. State*, 123 Md.App. 599, 620–22, 720 A.2d 27 (1998) ("We must determine if the judge who issued the search warrant had 'a substantial basis for concluding that the evidence sought would be discovered in the place described in the application.'"); *Trussell v. State*, 67 Md.App. 23, 29, 506 A.2d 255 (1986) (*"[T]he reviewing judge does not* (at the suppression hearing level or at the appellate level) *make a de novo determination of probable cause* but simply determines whether there was a 'substantial basis' for the warrant-issuing magistrate's determination that probable cause existed." (Emphasis supplied)).

In *Herbert v. State*, 136 Md.App. 458, 486–87, 766 A.2d 190 (2001), this Court picked up on *Illinois v. Gates's* explanation of why reviewing courts are, and ought to be, thus deferential in their review of search warrants.

> Over the course of decades, *the Supreme Court* has not been content to deliver to American prosecutors and American police a schoolmarmish civics lesson or lecture on

investigative restraint. *It has,* in an exercise of shrewd practicality, *provided prosecutors and police with significant incentives for searching and seizing via the favored or preferred modality,* to wit, with judicially issued warrants. Conversely, it has strewn the field with at times vexing disincentives for operating in the disfavored or non-preferred modality, to wit, warrantlessly. The Introduction to William W. Greenhalgh, *The Fourth Amendment Handbook,* Criminal Justice Section of the American Bar Association (1995), p. 9, describes the sage deployment of "the stick and the carrot" by the Supreme Court:

> In encouraging the police to act in the preferred warranted mode rather than in the nonpreferred warrantless mode, *the Supreme Court has,* in a very practical way, *"put its money where its mouth is." It has given law enforcement an "edge" when it takes the trouble to investigate in the preferred manner* .... In a variety of ways, *law enforcement has been given a bonus for relying on such warrants.*

(Emphasis supplied).

In *West v. State,* 137 Md.App. 314, 322, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001), Judge Thieme reaffirmed that deference to a warrant-issuing judge's determination of probable cause is something owed by the suppression hearing court as well as by the appellate courts.

> *Reviewing courts (at the suppression hearing level or at the appellate level) do not undertake de novo review* of the magistrate's probable cause determination but, rather, pay "great deference" to that determination. Reflecting a preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that, so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.

(Emphasis supplied).

In *State v. Riley,* 147 Md.App. 113, 117–18, 807 A.2d 797 (2002), this Court was discussing the limitations on subsequent

judicial review of "no-knock" warrants rather than on warrants generally. That discussion, however, is equally pertinent to the review of warrants generally.

The principle controlling our decision is that *neither the appellate court nor the suppression hearing court is authorized to make the decision on the merits* .... That decision was delegated exclusively to the judge who was called upon to include that provision in the warrant. *The limited after-the-fact review permitted either the circuit court or the appellate court requires that the reviewing judges transcend any personal opinion as to what they, coincidentally, might have decided on the merits and concern themselves exclusively with whether the warrant-issuing judge had some rational basis for reaching the decision he did.* The focus ... should be only on the legitimacy of another judge's prior decision in that regard.

(Emphasis supplied).

In *Fitzgerald v. State,* 153 Md.App. 601, 627, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), this Court again stressed the limited reviewing role of a suppression hearing court when dealing with a search warrant.

Once again, *[the suppression hearing judge]* commendably recognized the constraints on her reviewing role. She *did not presume to find probable cause. That was not her job.* What *she found* was *that [the warrant-issuing judge] had had a "substantial basis" for finding probable cause. That was her job.*

(Emphasis supplied).

In that case, we elaborated on the limited nature of judicial review when applied to the issuance of a search warrant.

When, by contrast, the subject before the suppression hearing is the issuance of a warrant, as it partially was in this case, the focus of both the suppression hearing court and the appellate court shifts dramatically. With respect to the warrant that was issued on March 21, Judge Gelfman was not the judge of first impression. Judge Ellinghaus–Jones was, and *Judge Gelfman,* like us, *sat only in a far*

*more restrained reviewing capacity,* subject to the typical appellate disciplines. *Whether she herself would have issued the warrant was beside the point,* just as whether we would have issued the warrant is beside the point. *All that mattered was that Judge Ellinghaus–Jones had had a "substantial basis" to justify her having done so.*

153 Md.App. at 653, 837 A.2d 989 (emphasis supplied).

In *Volkomer v. State,* 168 Md.App. 470, 486, 897 A.2d 276 (2006), Judge Kenney referred to the preferred status of warrants in terms of the warrant's enjoying a presumption of validity.

Appellant asserts that the burden was on the State to prove by a preponderance of evidence that the evidence the State sought to introduce was obtained legally. We disagree. *When the State seeks to introduce evidence obtained pursuant to a warrant, "there is a presumption that the warrant is valid[,]"* and "[t]he burden of proof is allocated to the defendant to rebut that presumption by proving otherwise." The presumption that a search warrant is valid provides an incentive to police officers to seek judicial approval before effectuating a search. ("When the State has procured evidence of guilt by the favored and preferred modality of a warranted search, it is rewarded by a presumption of validity in favor its warrant application.").

(Emphasis supplied).

## C. Our Deference Is To The Warrant–Issuing Judge, Not to the Suppression Court

██ It is commonplace that upon appellate review our mandate is to be deferential. The question, however, is, "Deferential to whom?" In a review posture such as the present one, the deference that is owed by us is to the warrant-issuing judge, just as the deference of the suppression hearing judge was owed to the warrant-issuing judge. This is inherent in the substantial-basis test. In *Fitzgerald v. State,* 153 Md.App. at 653–54, 837 A.2d 989, we described specifically the nature of our review in a posture such as this.

Upon appellate review of the issuance of a warrant, *we do not so much review the decisional process of the suppression hearing judge as we sit in the place of the suppression hearing judge. Our primary focus,* as was the focus of Judge Gelfman, *is upon the warrant-issuing magistrate and the "substantial basis" vel non for her decision.*

(Emphasis supplied).

The spirit that should thus animate a reviewing court's deference to a warrant was best articulated by the Supreme Court in *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965):

These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, *affidavits for search warrants,* such as the one involved here, *must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion.* They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. *Technical requirements of elaborate specificity* once exacted under common law pleading *have no proper place in this area. A grudging or negative attitude by reviewing courts* toward warrants *will tend to discourage police officers from submitting their evidence to a judicial officer before acting.*

(Emphasis supplied). See also *Tucker v. State,* 244 Md. 488, 497, 224 A.2d 111 (1966); *Henderson v. State,* 243 Md. 342, 346, 221 A.2d 76 (1966); *State v. Swales,* 12 Md.App. 69, 73–75, 277 A.2d 449 (1971).

As a practical incentive for prosecutors and police to search, whenever possible, with warrants, the Supreme Court has sent a clear signal to reviewing judicial referees to give the State the benefit of the "close calls" when the validity of a search warrant is in issue. In *Herbert v. State,* 136 Md.App. at 489–90, 766 A.2d 190, this Court picked up on that theme of awarding the "close calls" as a deliberately applied incentive for good police behavior.

The Supreme Court is telling judges generally to *use "straight talk" with American police officers, convincing them that it will be "to their advantage" whenever they take the trouble to get warrants.*

The incentive of having the "close calls" go in one's favor is particularly strong when fine balances of probable cause are on the scales. Although there is a tendency to think, with Gertrude Stein, that probable cause is probable cause is probable cause, the reality is not always that clear-cut. *When the probable cause issue is right on the cusp, when it teeters at the brink and could be nudged in either direction by a feather, the Fourth Amendment's preference for warrants asserts itself as the critical tie-breaker.* Most frequently, to be sure, the "call" as to probable cause will be "up" or "down" regardless of the investigative modality. Statistically, however, *there will be enough agonizingly close calls over the course of an investigative season to make it a pronounced advantage to hold the tie-breaker in one's pocket.*

(Emphasis supplied).

The likelihood that the scales could be weighted in one direction or the other, thereby manifesting the reviewing court's approval or disapproval, appeared as handwriting on the wall as early as *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

If probable cause were an absolute or a mathematical immutability, those words would be pointless.

*Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), also made clear that the same quantum of suspicion that might not suffice in the warrantless investiga-

tive context might well carry the day when a warrant application is being reviewed.

*[W]hen a search is based upon a magistrate's,* rather than a police officer's, *determination of probable cause, the reviewing courts will accept evidence of a less "judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant."*

(Emphasis supplied). *United States v. Ventresca,* 380 U.S. at 109, 85 S.Ct. 741, also made reference to the preference that frequently serves as a tiebreaker:

Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, *the resolution of doubtful or marginal cases* in this area *should be largely determined by the preference to be accorded to warrants.*

(Emphasis supplied). The preference clearly can influence the measurement.

Greenhalgh, *Fourth Amendment Handbook,* p. 9, also refers to the shifting standard for measuring probable cause.

[I]n a marginal case that could go either way, *the quantum of suspicion that will qualify as probable cause in the context of a warrant review is less than that which may be required to support warrantless activity.*

(Emphasis supplied).

Sitting en banc in *Hignut v. State,* 17 Md.App. 399, 413, 303 A.2d 173 (1973), this Court subscribed to the principle of backing up the judicial preference for warrants by providing the practical incentive of a favorable tiebreaker.

*We are admonished,* in the interests of enhancing the Fourth Amendment protections, *to "accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.'"* ... Under that mandate, the furthering of valuable liberties under the Fourth Amendment requires that we read possibly ambiguous language with an eye

toward upholding the warrant rather than toward striking it down.

(Emphasis supplied).

In the service of this constitutionally mandated interpretive approach, we will be deferential to the warrant-issuing judge as we assess whether there was a substantive basis for the warrant. As a practical matter, that means that, at the very least, we will accept Judge Campen's implicit fact-finding, unless clearly erroneous, and, beyond that, we will view the factual recitations in the warrant application in the light most favorable to the State. The deference goes well beyond that. It does, however, include both of those manifestations of deference.

## D. What Exactly Is a "Substantial Basis" for Issuing a Warrant?

The caselaw overwhelmingly demonstrates that finding a "substantial basis" for the issuance of a warrant means something less than establishing probable cause in the context of reviewing warrantless police activity. In *State v. Amerman, supra,* this Court undertook a further analysis of the "substantial basis" test and concluded that it means less than establishing a legally sufficient or *prima facie* case, to wit, some factually sufficient allegations as to each and every element of some set of required elements. We looked first at the requirement for meeting the *prima facie* case standard generally.

> The "substantial basis" standard is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact finding in a trial setting. Although in that setting an appellate court may not, of course, determine credibility or weigh evidence for itself, it does nonetheless insist that there be some credible evidence which, if believed, could establish each and every distinct element of an offense. *Williams v. State,* 5 Md. App. 450, 247 A.2d 731 (1968); *Metz v. State,* 9 Md.App. 15, 262 A.2d 331 (1970). In a jury trial, the judge, as a legal referee, must subject the evidence to this test of legal

sufficiency—this requirement of a *prima* facie case—before passing the question to the jury. In the bench trial, the judge must, in effect, subject the evidence to the same test before passing the question from the left hemisphere of his brain (where he functions as a legal referee) to the right hemisphere of is brain (where he functions as a lay fact finder with subconscious feelings and nonverbal senses intermingling with logic in his final verdict). If that final verdict is not supported by such a *prima facie* or legally sufficient case, it is, by definition, clearly erroneous. *Williams v. State, supra; Metz v. State, supra.* The fact-finding judge is, in short, held to the standard of a legal technician.

84 Md.App. at 472, 581 A.2d 19 (emphasis supplied).

The warrant-issuing judge, by contrast, is not held to the same standard of the legal technician.

It is not so with the warrant-issuing magistrate. "The judge's task is 'simply to make a practical, common-sense decision' whether probable cause exists." *Birchead v. State, supra,* 317 Md. at 701, 566 A.2d 488, quoting *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. " *'[T]he quanta . . . of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant."* *Illinois v. Gates,* 462 U.S. at 235, 103 S.Ct. at 2330. The magistrates themselves are admonished to remember that the supporting affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca,* 380 U.S. at 108, 85 S.Ct. at 746. *Illinois v. Gates* reminded us, 462 U.S. at 235–236, 103 S.Ct. at 2330, that the warrant-issuing magistrates themselves need not be legally trained, that search warrants "long have been issued by persons who are neither lawyers nor judges" and that "warrants are—quite properly . . .— issued on the basis of nontechnical, commonsense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings."

84 Md.App. at 473, 581 A.2d 19 (emphasis supplied). See also *Patterson v. State,* 401 Md. at 119–20, 930 A.2d 348 (Dissenting opinion by Battaglia, J.); *State v. Coley,* 145 Md.App. 502, 521–22, 805 A.2d 1186 (2002).

Our review of the Supreme Court pronouncements left no doubt of the fact that a "substantial basis" test for issuing a warrant did not require the establishing of a prima facie or legally sufficient case of criminal activity.

Thus, while the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be proved-to wit, that a *prima facie* case be established— *Illinois v. Gates rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach* wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another. *Illinois v. Gates* expressly stated, 462 U.S. at 235, 103 S.Ct. at 2330, that *a legally sufficient or prima facie* showing is not required:

"*[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'* "

*Id.* (emphasis supplied).

### E. The "Controlled Buy"

■ Over the course of three full pages, the applicant for the warrant, Detective Corporal Jones, recited his extensive specialized training and field experience as a narcotics investigator, including, significantly, his experience as a surveillance officer. Turning to the specifics of the present case, Detective Jones recited that in September of 2006, a suspect was arrested by the Special Operations Division and that the suspect then became a confidential informant ("CI"). The CI provided information "regarding ongoing criminal activity in the area of the Rails to Trails between Dover and Goldsborough St., Easton, Md." The CI advised that "several suspects sell crack cocaine on the trail." Detective Jones arranged with the CI to make a controlled buy from the appellee.

During the fourth week of September 2006 your affiant met with a confidential informant for the purposes of making a controlled purchase of crack cocaine within the Town of Easton. CI advised he/she could make a controlled purchase of crack cocaine from a suspect in the areas of the Rails to Trails who goes by "D", also known as Demetrius, who is described as a heavy set black male with a dark complexion.

Jones has received information from other sources regarding the same suspect who has been identified as Demetrius Sylvester Jenkins DOB: 04/15/71.

During the fourth week of September 2006 your Affiant, Cpl. John F. Jones met with a confidential informant for the purposes of *planning a controlled purchase of a controlled dangerous substance* from Demetrius Jenkins. The CI was briefed on the plan and agreed to making the controlled purchase under my direction. *Det. Bordley and your Affiant were assigned to conduct surveillance for this operation. Your affiant was also assigned to handling the CI.*

(Emphasis supplied).

In the application for the warrant, Detective Jones then recited his description of the "controlled buy" itself.

Your Affiant met with the CI at a secluded location within the Town of Easton. At the location *a complete and thorough search was done of the CI. No controlled dangerous substances were located on his/her person.* Your *Affiant then explained the route the CI was to take to make the controlled purchase. Your Affiant then handed the CI an amount of U.S. currency* from the Easton Police Department Special Operations Drug Fund. *The CI then went the predetermined route and met with Jenkins. An exchange for U.S. currency took place for crack cocaine. After the buy* took place *the CI then went back to the predetermined location and [met] with your Affiant.*

At the predetermined location, your affiant took possession of the suspected crack cocaine. *A thorough search was then conducted of the CI.* There was no money or controlled

dangerous substances located on his/her person. The CI was then debriefed and excused. At the Easton Police Department your Affiant field tested the suspected crack cocaine utilizing a Narcotics Identification Kit cocaine ID swab which yielded a positive reaction for the presence of cocaine. The crack cocaine was placed in the Eastern Police Departments Evidence system.

(Emphasis supplied).

With respect to that "controlled buy," the bottom line is that if the controls were adequate, probable cause to issue the warrant to search the person of the appellee was *ipso facto* established. If, on the other hand, the controls were not fully adequate, some further analysis, considering other portions of the warrant application, would be required. A large part of the appellee's attack on the warrant application, both at the suppression hearing and in his appellate brief, is an attack on the credibility of the CI. The heart of that attack is that the State failed to establish for the CI any "track record" of demonstrated reliability in terms of the CI's past performance. If, however, the controls are adequate in a "controlled buy" exercise, the credibility of the controlled buyer is utterly immaterial.

The en banc decision of this Court in *Hignut v. State,* 17 Md.App. 399, 303 A.2d 173, is the leading Maryland case on the investigative technique of a controlled buy. In *Hignut,* we described the front end and the back end of the exercise.

Although the narrative language is again trimmed to the bone, its clear import is that the affiants (or the appropriate one of them) searched the informant and found him "clean," [4] and sent him into the suspect premises, whence he came out "dirty".[5] This is the typical "controlled buy" [6] investigative technique. So long as the controls are adequate, the "controlled buy" alone may well establish probable cause to search a suspect premises, let alone verify from scratch an informant's otherwise unestablished "credibility".

[4] That is, "without narcotics".

[5] That is, "with narcotics," as in the recent film classic, "Dirty Harry".

[6] That the contraband "sample" was given away rather than sold is immaterial in establishing the probable whereabouts of the "mother lode". Nor is it cause to discard a phrase of such general utility and accepted usage as "a controlled buy".

17 Md.App. at 412, 303 A.2d 173.

If the rest of the controls, linking up the front end to the back end of the exercise, are established, the credibility of the buyer is self-evidently beside the point, as *Hignut* went on to point out.

*If the informant had been nothing more than a robot or a trained ape, the directly observed "controlled buy"*—with the informant as a mere mechanical agent—*would have been sufficient to establish probable cause.*

*Id.* at 415, 303 A.2d 173 (emphasis supplied).

In this case, the controls at the front end and at the back end—the CI went in "clean" and came out "dirty"—were expressly established. It is the middle which is in issue. Was the "buy" itself directly observed? That is ambiguous. We do not absolutely know, one way or the other, because the critical event is unfortunately described in the passive voice: "An exchange for U.S. currency took place for crack cocaine." From what was recited as having happened just before the buy and just after the buy, however, it could be inferred that the CI remained under the direct visual observation of the police. It could also be inferred, on the other hand, that he did not. At the suppression hearing, the court declined to make the inference urged upon it by the State.

THE PROSECUTOR: [T]he operative point of this warrant, the part ... that gave the Judge that issued the warrant the basis was what's known as a controlled buy....

THE COURT: No, *we don't know it was a controlled buy .... We don't know that at all .... We know that this man left,* for all that the warrant shows, left *the view of the affiant and came back later and said, "I made a buy."*

That's all that there is. There is no evidence. As I've said, I've never seen a warrant before where the police didn't follow and watch the CI go in and out ... I mean *this unknown person walks off into the evening and comes back without some money. And he has some drugs. We don't know what he did with [the money]. We don't know where they [the drugs] came from.*

(Emphasis supplied).

The State's Attorney challenged that assumption. He and the judge ultimately agreed that the recitation in the application did not establish with any certainty whether the buy had been directly observed by the police or not.

MR. PATTERSON: Your Honor, with all due respect the Court is ... making an assumption. *The warrant is* silent as to whether or not the officers, from the time they searched them and found them to have no drugs or money and gave him money, which is specified in the warrant, it's *silent as to whether they followed him and watched from that point on or not.*

THE COURT: *It certainly is.*

. . . .

THE COURT: It's silence must be observed because ... I'm, not to interpolate anything into it. I must read it and base the determination on its four corners.

MR. PATTERSON: I understand that. I understand that. But *since it's silent ... you've got two things that could have happened, either they did follow him or they didn't.* But it's silent and *Mr. Jennings is saying well since it's silent therefore it means they didn't.* And *all I'm saying is you can't make that assumption.* All you can ... know is *it doesn't say what they did.*

THE COURT: *I'll agree with you.* But let me say *at the same time you can't make the assumption that he did.*

MR. PATTERSON: And *I'm not assuming that. All I'm saying is it's silent.*

THE COURT: *All right.*

(Emphasis supplied).

How, then, should the ambiguity be resolved? Using the appropriately deferential "substantial basis" standard, we hold that Judge Campen would have been permitted to draw the inference that the buy, which occurred outside in the open air, did take place under direct police surveillance. The application had recited that "Detective Bordley and your Affiant were assigned to conduct surveillance for this operation." With no indication of any glitch in the operation, the application routinely described a step-by-step exercise. "Your Affiant then explained the route the CI was to take to make the controlled purchase. Your Affiant then handed the CI an amount of U.S. currency.... The CI then went the predetermined route and met with Jenkins. An exchange for U.S. currency took place for crack cocaine. After the buy took place the CI then went back to the predetermined location and met with your Affiant. At the predetermined location, your Affiant took possession of the suspected crack cocaine." It is a Hemingwayesque rat-tat-tat of short declarative sentences.[1]

---

1. At the suppression hearing, the State's Attorney proffered that Detective Jones was standing by and was prepared to testify under oath that during the entire course of the controlled buy, he had the CI under his direct visual observation at all times and that he saw the buy take place. Because the validity of the warrant has to be determined exclusively on the basis of what is contained within the "four corners" of the warrant and warrant application, both sides agreed and the judge properly ruled that the proffered testimony could not be received on that issue. *Greenstreet v. State,* 392 Md. at 669, 898 A.2d 961, *Valdez v. State,* 300 Md. 160, 168, 476 A.2d 1162 (1984); *Smith v. State,* 191 Md. 329, 335–36, 62 A.2d 287 (1948).

 The State, however, offered the testimony on the distinct issue of the good faith exception. We will discuss the admissibility of such evidence on that issue in Part II of this opinion. On the first issue of determining what the words in the warrant application actually connoted, it is enough for us to note ruefully, as we did in *Hignut v. State,* 17 Md.App. at 410 n. 2, 303 A.2d 173, "We labor to do indirectly what could so simply have been done directly." Eschew the passive voice! It is not enough to know what happened; it is important to know how we know it happened. We must somehow avoid the gap between what the police work up and what the police write down.

 What does the standard of review tell us should be done with an inference that could be drawn or could be declined? Which way is the table tilted? When the validity of a warrant is the issue, *Hignut v. State*, 17 Md.App. at 413, 303 A.2d 173, directs us as to how to resolve such ambiguity: "[T]he Fourth Amendment requires that we read possibly ambiguous language with an eye toward upholding the warrant rather than toward striking it down." It seems that Judge Campen implicitly found that the controlled buy was made under police surveillance, and such a finding would not have been clearly erroneous. Lacking that, that version of the facts recounted in the application most favorable to the State would be the version in which the inference is drawn. *A fortiori*, what was before Judge Campen afforded him a substantial basis for the issuance of the warrant. That, in and of itself, is sufficient reason to vacate the suppression order.

**F. Alternative Grounds for Finding a "Substantial Basis"**

 Even if, however, we were to assume, purely *arguendo*, that the police surveillance of the "controlled buy" was not uninterrupted, we would then have to turn with a more critical eye to what we know about the CI. Although *Illinois v. Gates* in 1983 liberated law enforcement from the theretofore rigid constraints of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and the legendary "two-pronged test," much of the analysis that informed the *Aguilar–Spinelli* regime still enhances our understanding of how to handle information from informants.[2]

---

2. As the Supreme Court recognized in *Illinois v. Gates*, 462 U.S. at 229 n. 4, 230 n. 5, 233 n. 8, 103 S.Ct. 2317, Maryland had probed as deeply as anyone into the ramifications and nuances of *Aguilar–Spinelli*. See *Stanley v. State*, 19 Md.App. 507, 313 A.2d 847 (1974); *Thompson v. State*, 16 Md.App. 560, 562–68, 298 A.2d 458 (1973); *King v. State*, 16 Md.App. 546, 554–57, 298 A.2d 446 (1973); *Dawson v. State*, 14 Md.App. 18, 24–42, 284 A.2d 861 (1971); *Dawson v. State* 11 Md.App. 694, 699–713, 276 A.2d 680 (1971).

The first of the two prongs—the two necessary inquiries—was universally referred to as the "basis of knowledge" prong. Its focus was, "Even if the informant is telling the truth, how does the informant know what he's talking about?" That historic, and still vital, inquiry poses no problem in this case. The CI, both in the past and on the day described in the warrant application, purchased cocaine directly from the appellee.

It is the other prong, or inquiry, that becomes critical in this case, if, *arguendo,* the need for its satisfaction is not obviated by the adequacy of the controls on the controlled buy. This prong was universally referred to as the "veracity" prong. Its focus was, "Why should we believe the informant?" That veracity prong actually consisted of two separate spurs or modalities of satisfaction. With respect to the satisfaction of this prong, *Aguilar,* 378 U.S. at 114–15, 84 S.Ct. 1509, required that the warrant-issuing judge be informed of "some of the underlying circumstances from which the officer concluded that the informant ... was 'credible' or his information 'reliable.' " That test, in the disjunctive, was further explicated by *Spinelli,* 393 U.S. at 415–18, 89 S.Ct. 584. For a professional police informant, one from the "criminal mileau" rather than a "citizen-informer," the usual way of establishing credibility directly was by showing a "track record" of reliable past performances. There was, to be sure, no such showing with respect to the CI in this case.

The reliability spur, however, provides an alternative way of satisfying the veracity prong. Information available to the police, other than through the mouth of the informant, may adequately corroborate the informant's story. *Spinelli,* 393 U.S. at 415, 89 S.Ct. 584, described this buttressing technique.

> If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearing report should then be considered.

In *Hignut v. State,* 17 Md.App. at 411, 303 A.2d 173, this Court described this alternative way of establishing veracity.

*Spinelli,* however, points out an alternate route to the establishment of "credibility". Even where the internal evidence about the informant himself, or about the circumstances under which the information was furnished, fails to establish intrinsically personal "credibility" or informational "reliability," *external evidence, contained elsewhere in the application, may be examined to see what buttressing it provides. Independent police observation may tend to verify—to corroborate—the story as told by the informant. A direct showing that some of the story has been verified as true lends credence to the remaining unverified portions of the story.* How much verification is needed depends upon how much bolstering the "credibility" requires.

(Emphasis supplied).

This alternative verifying technique is regularly referred to as that of "independent police verification." The technique enjoys the endorsement of 2 Wayne R. LaFave, *Search and Seizure* (3d ed. 1996), § 3.3(f), p. 167, with a nod of approval to Maryland analysis.

Assume now a situation where information has been obtained from an informant in such a manner as to show his basis of knowledge (i.e., a direct statement of the basis, or a recitation of self-verifying details), but without indicating veracity in any of the ways previously discussed. *Is it possible that corroboration may remedy this deficiency?* None of the Supreme Court opinions previously summarized question such use of corroborating facts, and rightly so. As explained in the well reasoned case of *Stanley v. State,* [19 Md.App. 507, 529, 313 A.2d 847 (1974)];

The relevance of this particular remedy to this particular defect is clear. When independent police observations have verified part of the story told by an informant, that *corroboration lends credence to the remaining unverified portion of the story by demonstrating that the informant has, to the extent tested, spoken truly.* * * * The verification helps to demonstrate his "credibility." *Present good performance shows him to be probably "credible" just as surely as does past good performance.*

(Emphasis supplied). See also *West v. State*, 137 Md.App. 314, 337–46, 768 A.2d 150 (2001).

There was in this case a lot by way of independent police verification of the CI's veracity. Even assuming, therefore, that his/her veracity was in issue, that veracity could not be summarily dismissed simply because of the absence of a "track record" of past performances. There was independent police verification.

### 1. The CI Was Not an Anonymous Tipster

A minor factor, but one nonetheless worth noting, was that the CI was not an anonymous tipster. The CI had been arrested by the Special Operations Division within the preceding three weeks and was known to them. The CI's cooperation with the police was presumably in exchange for some sort of immunity, protection, or other favorable treatment. We are not for a moment suggesting that this relationship is enough to establish the CI's credibility. It is not. It does, however, move the CI a little bit up the credibility scale, compared to an anonymous telephone tipster or letter writer.

In *Cross v. State*, 165 Md.App. 164, 187, 884 A.2d 1236 (2005), Judge Salmon explained the significance of the informant's being known to the police.

The case *sub judice* is distinguishable from *Florida v. J.L., supra*. Here the informant's basis of knowledge was established, i.e., he told Officer Knox that he saw appellant brandish a gun. Second, *the informant confronted Officer Knox directly and made no effort to hide his identity*. By doing so, he exposed himself to the very real possibility that he would be questioned and his identity revealed. Moreover, even if he had balked at giving his name to the police, his identity could still have been ascertained easily because he drove a car. Unlike the situation in *Florida v. J.L., the informant*, by coming forward to the police, *put himself in a position where he could be held accountable if his information proved false. Thus, the likelihood that the information was reliable was much greater than if the information had been obtained from a truly anonymous tipster* such as

the one described in the *J.L.* case. For this reason, *an informant who makes a face-to-face report of a crime to a police officer is significantly less likely than an anonymous telephone tipster to be merely engaging in a prank or otherwise trying to mislead the police.*

(Emphasis supplied).

In *Massey v. State,* 173 Md.App. 94, 107, 917 A.2d 1175 (2007), Judge Sharer wrote to the same effect.

Although Marzec did not explain that Griffith had provided information in the past, and thus had no "known" track record, *Griffith clearly was not an "unknown" informant. " '[I]t is improper to discount [out of hand] an informant's information simply because he has no proven record of truthfulness or accuracy.' "* *United States v. Canfield,* 212 F.3d 713, 719 (2d Cir.2000).... On the contrary, we believe the motions court could readily infer from the totality of the circumstances that *Griffith,* a target of a search and seizure warrant *who had his own troubles with the police, was "known"* because he had been identified and provided the information face-to-face. For example, in *United States v. Couch,* 367 F.3d 557, 560 (6th Cir.2004), the court, in rejecting the argument that police failed to show that the provider of information was a "reliable informant," observed that the informant's identity was known to police, had been named in the affidavit, and could be held accountable for lying to the police. *See Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (known informant can be held responsible).

Again, Griffith was neither a confidential informant, nor an anonymous tipster.... *He was caught red-handed after police executed a search and seizure warrant for his room, and,* after being "interviewed" by the police, *arranged to set up a drug buy from Massey.* The fact that Griffith was interviewed "face to face" by Marzec strengthens the reliability of his information. *United States v. Greenburg,* 410 F.3d 63, 67 (1st Cir.2005).

(Emphasis supplied). See also *Herod v. State*, 311 Md. 288, 296–97, 534 A.2d 362 (1987).

## 2. The Appellee's Criminal Record

Although no mention was made of it at the suppression hearing, the warrant application recited the appellee's significant criminal history, including two arrests for the possession and/or distribution of narcotics, one of them within the immediately preceding year.

Criminal History Check: Demetrius Sylvester Jenkins has a Criminal History and FBI number 984995LA9. Jenkins has the following Criminal History.

- 07/23/91 arrested by the Easton Police Department for Attempted Murder, Assault with Intent to Maim, Possession of Deadly Weapon.

- 09/08/91 arrested by the Maryland State Police for *Distribution of Crack Cocaine*

- 06/14/00 arrested by the Maryland State Police for 1st Degree Burglary, Assault 2nd Deg. And Malicious Destruction of Property.

- 08/27/06 arrested by the Talbot County Sheriffs Department for Unauthorized use of Motor Vehicle, *CDS Possession not Marijuana, CDS Possession Paraphernalia.*

- Jenkins also has numerous arrest for Parole Violations.

(Emphasis supplied).

In assessing probable cause, that criminal record has significance. In *Gatewood v. State*, 244 Md. 609, 616, 224 A.2d 677 (1966), Judge Oppenheimer observed for the Court of Appeals:

Knowledge of prior convictions of the person observed is one of the elements to be considered in determining whether there is probable cause.

See also *Peterson v. State*, 281 Md. 309, 320, 379 A.2d 164 (1977); *Shrout v. State*, 238 Md. 170, 174, 208 A.2d 585 (1965).

In *Malcolm v. State*, 314 Md. 221, 232, 550 A.2d 670 (1988), the Court of Appeals similarly observed:

[T]he fact that the initial suspect, as well as the two men with whom he met, had *prior involvement with the exact drug predicted for distribution is no small consideration.* (Emphasis supplied). Even when dealing with criminal charges at some time "in the past," Chief Judge Murphy pointed out in *Birchead v. State,* 317 Md. at 703, 566 A.2d 488:

That the police confirmed *that two of the suspects had been charged in the past with possession of a controlled dangerous substance* (one with intent to distribute) *was a factor to be taken into account in applying the "totality of the circumstances"* formulated in *[Illinois v.] Gates.*

(Emphasis supplied).

In *State v. Amerman,* 84 Md.App. at 484–85, 581 A.2d 19, this Court looked to numerous Supreme Court precedents in holding that prior arrests (or even reputation) are significant factors in the probable cause equation.

The Supreme Court case law makes it clear that *not only prior convictions but also prior arrests and even a criminal reputation may be significant factors in the probable cause equation.* In *Brinegar v. United States,* 338 U.S. 160, 162, 69 S.Ct. 1302, 1304, 93 L.Ed. 1879 (1949), *rehearing denied,* 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), probable cause to believe that Brinegar was illegally transporting liquor was based in part upon the fact that five months earlier Brinegar had been arrested for a similar offense and that Brinegar had "a reputation for hauling liquor." In *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a factor in the accumulation of probable cause of bootlegging was the police observation of two or the suspects selling bootleg liquor three months earlier. In *United States v. Harris,* 403 U.S. [573] at 583, 91 S.Ct. [2075] at 2081[, 29 L.Ed.2d 723 (1971)], the Supreme Court described the value of a criminal's reputation in verifying an informant's credibility:

"*We cannot conclude that a policeman's knowledge of a suspect's reputation*—something that policemen frequently know and a factor that impressed such a 'legal techni-

cian' as Mr. Justice Frankfurter—*is not a 'practical consideration* of everyday life' *upon which* an officer (or *a magistrate) may properly rely in assessing the reliability of an informant's tip."*

(Emphasis supplied).

In *State v. Amerman,* the warrant application had recited a prior arrest and conviction, within the year, for the "same type of offense." The suppression hearing judge "totally discounted the significance." In reversing the order of suppression, this Court observed:

> The suppression hearing judge nonetheless seemed to dismiss this information as totally without significance.
>
> . . . .
>
> *There is no suggestion in that of any deference,* let alone "great deference," *to Judge Lerner's apparent decision that the prior criminal record for the same crime did have significance for him.*

The case law is far kinder toward the prior criminal record, if not toward the prior criminal. In *Dawson v. State,* 11 Md.App. 694, 708, 276 A.2d 680 (1971), we observed:

> "The affiant ascertained that the appellant, less than three years before the current observations, had been arrested and convicted of gambling violations. In interpreting otherwise ambiguous conduct, *a man's history of criminal activity may well be of probative force.* Although, as we observed in *Silbert v. State,* 10 Md.App. 56, 65, [267 A.2d 770 (1970)] *a convicted gambler* does not forever after walk through life 'enveloped in probable cause,' he, nevertheless *is burdened by a history that does at least lend interpretative color to otherwise ambiguous activity."*

84 Md.App. at 483–84, 581 A.2d 19 (emphasis supplied).

The significance of a criminal history, especially when it involves the same type of crime, provoked our comment in *Malcolm v. State,* 70 Md.App. 426, 432, 521 A.2d 796 (1987),

*aff'd in part, vacated in part on other grounds,* 314 Md. 221, 550 A.2d 670 (1988):

> On the street, if not at the trial table, *an individual carries with him inextricably the burden of his reputation.*

(Emphasis supplied). See also Judge Diana Motz's opinion for the Fourth Circuit Court of Appeals in *United States v. Bynum,* 293 F.3d 192, 197 (4th Cir.2002) (An officer's report in his affidavit of "the target's prior ... criminal record is clearly material to the probable cause determination."). And see *Patterson v. State,* 401 Md. 76, 108, 930 A.2d 348 (2007); *Holmes v. State,* 368 Md. 506, 518–19, 796 A.2d 90 (2002).

Judge Thieme gave us an excellent summary of the significance of a criminal record in assessing probable cause in *West v. State,* 137 Md.App. 314, 350, 768 A.2d 150 (2001):

> *His arrest for possession of marijuana ...,* and *numerous other arrests* within approximately the ten years preceding the issuance of the warrant, *were clearly relevant to the probable cause determination* in this case.

(Emphasis supplied).

### 3. Other Independent Verification

As the warrant application recited, the CI reported "ongoing criminal activity" in the area of Easton in question, including both the selling of crack cocaine and prostitution. Detective Jones, on the basis of his own experience, corroborated that aspect of the CI's report.

> Suspect herein referred to as CI provided your affiant Cpl. John F. Jones with information regarding ongoing criminal activity in the areas of the Rails to Trails between Dover and Goldsborough St. Easton, Md. CI advised that several suspects sell crack cocaine on the trail and several females solicit prostitution.

> *This information provided by CI has been corroborated by your Affiant who has conducted numerous drug investigations and purchased crack cocaine while working in the under cover capacity on the Rails to Trials.* Your affiant has also been involved in several arrests for prostitution in

this same location. *This area has also been recognized by the courts as an open air drug market.*

(Emphasis supplied).

The CI reported that one of the sellers of crack cocaine was the appellee. Detective Jones had also "received information from other sources" with respect to the appellee.

CI advised he/she could make a controlled purchase of crack cocaine from a suspect in the areas of the Rails to Trails who goes by "D", also known as Demetrius, who is described as a heavy set black male with a dark complexion. *Jones has received information from other sources regarding the same suspect who has been identified as Demetrius Sylvester Jenkins* DOB: 04/15/71.

(Emphasis supplied).

The most significant "independent police verification," however, was with respect to the "controlled buy" itself. Even if we assume, *arguendo,* that there was a gap in the direct surveillance, the direct observations of the police of what took place before the gap and what took place after the gap materially corroborate the CI's version of the controlled buy. The police, at the front end of the buy, searched the CI and determined that he/she had no drugs on his/her person but that he/she did have the requisite amount of cash. They saw him/her take the "predetermined route" toward the meeting. They saw him/her return to the "predetermined location," where they again searched him/her. At that time, inferentially a short time later, the police found on the CI crack cocaine but no cash. This is a classic example of the corroborative phenomenon that where part of the story told by the informant is verified as being true, the remaining unverified part of the story is more likely to be true.

In the pertinent context of a "controlled buy" situation, *Hignut v. State,* 17 Md.App. 399, 303 A.2d 173, is a textbook example of how even partial verification serves a salutary function. The informant in *Hignut* was to go into a residential apartment to make the controlled buy. The critical surveilling agent was a police clerk, Mrs. Duty. Under the most

unfavorable reading of the warrant application, Mrs. Duty was not in a position to observe directly which apartment the informant entered. The identification of the apartment entered was a critical factor. What was directly observed, however, even under the worst case scenario, was not thereby bereft of all inculpatory significance.

*We look now to the adequacy of the controls.* The application spelled out that 302 North Main Street was only a two-story apartment house. It spelled out that Mrs. Duty stationed herself "in the hallway of 302 North Main Street." *Under the most unfavorable of readings—that Mrs. Duty was downstairs and in no position to see where the informant went, once he was upstairs—the field of possibilities is still reduced to no more than two, or at most three, apartments.* This is a far cry from a surveillant's seeing, from the outside, an informant disappear into the bowels of a large, high-rise apartment house. *The mathematical reduction in the number of possibilities is, ipso facto, the ratio of improved probability.* Remembering that *independent observation need only verify a significant part, and not the totality, of an informant's story, even this unfavorable reading might well pass constitutional muster.*

17 Md.App. at 412–13, 303 A.2d 173 (emphasis supplied).

We did not find it necessary in *Hignut,* however, to rely on that verification of a part of the informant's story, because the "substantial basis" standard for reviewing a warrant directed us to resolve any ambiguity in whether the surveillance was unbroken by concluding that it was, indeed, unbroken.

We are instructed that "*the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants*". . . .

*We, therefore, read the clauses,* "went to the said apartment house, then to the second floor of the said house, knocked on the door of apartment # 3, and was permitted entrance to the said apartment # 3," *to be a recital of the direct observations of the affiant Mrs. Duty. This is a reasonable interpretation,* since more definite language that

followed established clearly that Mrs. Duty went inside 302 North Main Street and was "standing in the hallway". *The reasonable import of the application* is, further, that Mrs. Duty and the informant went immediately to 302 North Main Street together, after the informant had been searched and found "clean". *A fair reading of the application* establishes, further, that, upon exiting apartment # 3, the informant was observed by Mrs. Duty; the informant showed the contraband to Mrs. Duty; and the two of them went "directly" back to police headquarters and the waiting Sgt. Leftridge.

17 Md.App. at 413–14, 303 A.2d 173 (emphasis supplied).

Such a resolution of any ambiguity occasioned by the warrant application's lapse into the passive voice—"An exchange . . . took place."—would, as we have discussed, establish the warrant's validity directly. Even absent such a foreclosing resolution, however, the partial verification of the controlled buy would bring into play the constitutional principle which this Court has been espousing ever since *Dawson v. State,* 11 Md.App. 694, 703–04, 276 A.2d 680 in 1971.

> The necessary trustworthiness may then be established extrinsically by the independent verification of the affiant's direct observation. *If some of the significant details* of the informant's story *are shown to be,* in fact, *true, that encourages the magistrate to believe that all of the story is probably true.*

(Emphasis supplied).

This does not yet take into account the other independent police verification, such as 1) Detective Jones's own experience with respect to the "high crime" area involved; 2) the other observations about and identifying the appellee; and 3) more significantly, the appellee's criminal record, including a recent arrest (one year old) for the possession of narcotics and yet another arrest for the distribution of crack cocaine.

Along either of two distinct avenues to validation, therefore, we conclude that Judge Campen had a substantial basis to issue the warrant for the search of the person of the appellee.

For that reason, the evidence should not have been suppressed.

## Part II:
## The Good Faith Exception

■ When the suppression hearing court ruled that the warrant was defective, the State counterpunched with the good faith exception as its back-up position. At the hearing on July 9, 2007, the court temporarily deferred ruling on the good faith exception. It addressed it with its Order Suppressing Evidence of July 16, 2007, and denied its applicability. Because of our holding that there was a substantial basis for Judge Campen's issuance of the search warrant, the issue of the good faith exception to the Exclusionary Rule pursuant to *Massachusetts v. Sheppard* and *United States v. Leon* is in a sense moot. We are nonetheless constrained to address it, as an alternative holding, in an effort to stem the tide of what we perceive to be a recent and promiscuous overuse of *Leon's* rare exemptions from the good faith exception in a way that *Leon* never intended.

The basic rationale of *Sheppard* and *Leon* is easy. The Exclusionary Rule is intended to deter unreasonable police behavior, not judicial error. The judge may have made a mistake in issuing the warrant, but the officer is not unreasonable in relying on the judge's legal judgment. Accordingly, the officer is not unreasonable in executing a judicially issued warrant and thus exclusion is not called for even if the warrant is bad. *Leon,* to be sure, was careful "never to say never." There is, however, the almost Gilbert and Sullivan refrain of "Never? Well, hardly ever." [3]

### The Officer Is Not a Lawyer

The launching pad for all further analysis is the recognition by *Sheppard* and *Leon* that the police officer is not a lawyer and that the reasonableness of his investigative behavior, therefore, is not to be assessed as if he were. After reaffirm-

---

**3.** H.M.S. Pinafore.

ing that the only purpose of the Exclusionary Rule of Evidence is to deter unreasonable police behavior in the course of searching or seizing, *Massachusetts v. Sheppard*, 468 U.S. at 989–90, 104 S.Ct. 3424, stated emphatically that it is not unreasonable for an officer to rely upon a warrant issued by a neutral and detached judge.

> *[W]e refuse to rule that an officer is required to disbelieve a judge* who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested. In Massachusetts, as in most jurisdictions, *the determinations of a judge* acting within his jurisdiction, *even if erroneous, are valid and binding until they are set aside under some recognized procedure. If an officer is required to accept at face value the judge's conclusion that a warrant form is invalid, there is little reason why he should be expected to disregard assurances that everything is all right* ....
>
> ... *An error* of constitutional dimensions *may have been committed* with respect to the issuance of the warrant, *but it was the judge, not the police officers, who made the critical mistake. "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges."*

(Emphasis supplied).

The bulk of the 30–page majority opinion in *Leon* concentrated on the limited utility of the Exclusionary Rule as an implementing rule and on its narrow purpose of deterring unreasonable police activity. The opinion stressed that resort to judicially-issued search and seizure warrants is the core protection against unreasonable searches and seizures.

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be

sustainable where without one it would fall." *Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination.*

*Leon,* 468 U.S. at 913–14, 104 S.Ct. 3405 (emphasis supplied).

■ When, therefore, the *Leon* thesis proceeds, the officer has abided by this core Fourth Amendment commandment to submit the decision to search and seize to a neutral and detached judicial figure, the officer has been eminently reasonable and should not suffer the exclusion of valuable evidence, because exclusion is only intended to be a sanction for unreasonable police conduct. It will be, therefore, only in rare and unusual cases that exclusion will still be appropriate in cases where the officer has obtained a judicially-issued search warrant.

*[S]uppression* of evidence obtained pursuant to a warrant *should be ordered* only on a case-by-case basis and *only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.*

468 U.S. at 918, 104 S.Ct. 3405 (emphasis supplied). When the officer has obtained a warrant, only rarely will it be necessary to make further inquiry into whether the officer was reasonable.

We conclude that the *marginal or nonexistent benefits* produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant *cannot justify the substantial costs of exclusion* .... *"[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness."*

*Id.* at 922, 104 S.Ct. 3405 (emphasis supplied). This is the fountainhead of understanding to which any latter-day analysis must regularly return. The officer is not a lawyer.

## Maryland Has Followed Suit

In step with *Sheppard* and *Leon*, Maryland has consistently applied the good faith exception as directed by the Supreme Court. *Connelly v. State*, 322 Md. 719, 735, 589 A.2d 958 (1991) ("Even though the warrant was found to be invalid . . . we think that the officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related a present and continuing violation of law."); *Minor v. State*, 334 Md. 707, 715, 641 A.2d 214 (1994) ("[W]e shall assume that the suppression-hearing judge correctly concluded that Sgt. Clemens's affidavit failed to demonstrate probable cause. On the *Leon* issue, however, the absence of averments evidencing reliability of the confidential informant on prior occasions and of the informant's basis of knowledge is not necessarily fatal."); *McDonald v. State*, 347 Md. 452, 467–73, 701 A.2d 675 (1997); *Greenstreet v. State*, 392 Md. at 678–83, 898 A.2d 961; *Patterson v. State*, 401 Md. at 108, 930 A.2d 348 ("Although we have determined that there was no substantial basis to support a probable cause finding, we cannot say that Officer Haak was unreasonable in relying on the warrant."); *Trussell v. State*, 67 Md.App. 23, 29, 506 A.2d 255 (1986); *State v. Jacobs*, 87 Md.App. at 658, 591 A.2d 252 ("[I]t is clear that the officer did act in good faith reliance on the warrant, that the trial court's conclusion to the contrary was clearly erroneous, and that the evidence should not have been suppressed."); *Braxton v. State*, 123 Md.App. at 631–44, 720 A.2d 27; *Herbert v. State*, 136 Md.App. at 488, 766 A.2d 190; *West v. State*, 137 Md.App. at 351–56, 768 A.2d 150.

## The *De Novo* Determination of Good Faith

As we read the suppression hearing court's analysis of why Detective Jones, as a "reasonably well-trained officer," could not reasonably have relied on the warrant, the court does seem to have been under the mistaken impression that the warrant was for the search of the appellee's home and not simply the appellee's person. In ruling that the good faith exception was not applicable, the judge said:

In addition to the defects which we recognized at the hearing, *the application does not set forth any fact to support a conclusion that* criminal activity was conducted or that *contraband was to be found on the premises to be searched.* Accepting for the moment that the application and warrant sufficiently established that defendant had distributed a controlled dangerous substance (which we held it does not) *the application is completely silent as to the place where the transaction occurred. We do not believe that there is a common sense inference,* much less probable cause, *to believe that one who has committed a criminal act has contraband in his home solely on the basis of the criminal act itself.*

(Emphasis supplied).

■ We need not anguish unduly about the reasons given by the suppression hearing judge for denying the good faith exception, however, because, as Judge Greene pointed out in *Patterson v. State,* 401 Md. at 104–05, 930 A.2d 348, "a lower court's determination as to the applicability of the *Leon* good faith exception to the exclusionary rule is reviewed *de novo* when the facts are not in dispute. 'In making this determination, we consider all of the circumstances of the case.'" In *Connelly v. State,* 322 Md. at 735–36, 589 A.2d 958, Chief Judge Murphy wrote to the same effect.

As application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, *it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid. See Leon, supra,* 468 U.S. at 926, 104 S.Ct. at 3422; *United States v. Craig, supra,* 861 F.2d at 821. Thus, *the remand to the trial court* ordered by the Court of Special Appeals in this case *to decide,* as a question of fact, *whether the affiants acted in good faith* in believing that probable cause existed, *was not appropriate.*

(Emphasis supplied). See also *Minor v. State,* 334 Md. 707, 715–16, 641 A.2d 214 (1994); *Braxton v. State,* 123 Md.App. at 632, 720 A.2d 27; *State v. Jacobs,* 87 Md.App. 640, 650, 591

A.2d 252 (1991) ("It is for us ... to determine the legal significance of those facts-whether they demonstrate that the officer acted in good faith. We shall therefore ... make our own independent evaluation.").

### The Limited Exemptions and The
### Way Lawyers Read History

In *Herbert v. State,* 136 Md.App. at 488, 766 A.2d 190, this Court commented on what it expected to be the rarity of resort, or at least of successful resort, to the *Leon* exemptions.

A second strong incentive for searching with warrants is *the almost "fail-safe" security of being able to fall back on the "good faith" exception* to the Exclusionary Rule. Even when the warrant is bad, *the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches....* Under the *Sheppard– Leon* "good faith" exception to the Exclusionary Rule, *it is hard for the State to lose a suppression hearing.* It is equally hard to figure out why the State would not do everything in its power to exploit *that overwhelming advantage* whenever possible.

(Emphasis supplied).

Everybody, in 1984 at least, appreciated how sweeping the good faith exception was and how truly rare the *Leon* exemptions from it would be. With the passage of a quarter of a century, however, sensitivity to the rarity of the exemptions seems to be sadly waning. The *Sheppard–Leon* doctrine took the issuance of bad warrants for granted but routinely applied the good faith exception. What we are now seeing, however, is an almost epidemic tendency to treat the mere issuance of a bad warrant as if it were what *Herbert v. State, id.,* characterized as "the rarest and most outrageous of warrants." The exemptions from the rule are threatening to swallow the rule, despite *Leon's* assurance, 468 U.S. at 924, 104 S.Ct. 3405, that "[w]hen officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." It is that reassurance that is of late being seriously compromised.

The source of the problem is the way in which we read, or fail to read, history, although the history we are dealing with is only a quarter of a century old. As the years since *Leon's* promulgation have gone by, however, there has been an insidious tendency not to go back to the primary source but to rely on secondary sources, with their inevitable accretions of new language. For any serious student of history, it is an article of faith not to look to secondary sources if the primary source is available. Analysis is always treacherous when we take secondary and even tertiary sources as the starting point of that analysis. Lawyers, however, are notoriously poor students of history. The nature of their profession inclines them to exploit its possibilities rather than to cherish its accuracy. If one looks at a gloss and then at a gloss upon a gloss, with each additional gloss adding new accretions of language, the original message can easily become lost. If one wants to know what *Leon* said, reread *Leon*.

It behooves us, therefore, to see exactly what *Leon* had to say about the exemptions from the good faith exception and, especially, to see the cases it cited as examples of what circumstances might give rise to one of the exemptions.

## A. Exemption No. 1: Officer Provides Deliberately False Information

*Leon* listed four such sets of circumstances. The first was the self-evidently unreasonable situation in which the officer has furnished the judge with false and perjurious information. It is an extreme circumstance that has been handled since 1978 by the special procedure set forth by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). It is described by *Leon*.

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*.

*Id.* at 923, 104 S.Ct. 3405. And see *Patterson v. State,* 401 Md. at 105–06, 930 A.2d 348. This exemption rarely poses a problem.

## B. Exemption No. 2: Judge Abandons Judicial Role

The second of the circumstances listed by *Leon* as an exemption from the good faith exception is that in which the judge has totally abandoned his judicial role.

> The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York.*

*Id.* The lone example given is *Lo–Ji Sales v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), a case in which the judge actually went along on the search for pornographic films after issuing an open-ended warrant and indicated that he would review various items for their obscenity after they had been seized. This is also an extremely rare exemption from the good faith exception. See *Patterson v. State,* 401 Md. at 106, 930 A.2d 348.

## C. Exemption No. 4: Basic Elements Are Missing

It is at this point convenient to jump ahead and to look at *Leon's* fourth and final listed exemption. It also concerns the rare case in which the warrant is facially deficient in that it fails to specify the place to be searched or the things to be seized.

> Finally, depending on the circumstances of the particular case, a warrant may be so *facially deficient*—i.e., *in failing to particularize the place to be searched or the things to be seized*—that the executing officers cannot reasonably presume it to be valid.

468 U.S. at 923, 104 S.Ct. 3405 (emphasis supplied). The only illustrative example given was the companion case of *Massachusetts v. Sheppard,* where the particularity clause was woefully in error. Whereas the application for the warrant in *Sheppard* had focused exclusively on evidence connected to a homicide, a preprinted warrant form particularized the items

to be seized as narcotics and narcotic paraphernalia. The disparity was bizarre. *See also McDonald v. State,* 347 Md. 452, 473, 701 A.2d 675 (1997) ("We turn next to *Leon's* fourth exception.... The warrant identifies the place to be searched, the items to be seized, and the statute allegedly violated. We conclude that the warrant was not so facially deficient that a police officer could not reasonably conclude that it was valid."); *Patterson v. State,* 401 Md. at 110, 930 A.2d 348. None of these three exemptions typically poses any problem.

### D. Exemption No. 3: A Barely Conclusory Application

The growing problem is with *Leon's* third exemption.

Nor would an officer manifest objective good faith in ruling on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

468 U.S. at 923, 104 S.Ct. 3405.

Citation is made to the concurring opinion of Justice White in *Illinois v. Gates,* 462 U.S. at 264, 103 S.Ct. 2317, in which he refers to situations in which "it is plainly evident that a magistrate or judge had no business issuing a warrant." That is treacherously broad language. The citations given both by Justice White in his concurrence and by the *Leon* opinion itself, however, serve to keep the exemption within bounds by illustrating the extreme circumstance with which it is intended to deal. The exemption was clearly intended to deal with a purely conclusory statement in a warrant application backed up by no further supporting data. One of the examples given of a clearly inadequate warrant application was *Aguilar v. Texas,* 378 U.S. at 109, 84 S.Ct. 1509, where the application simply recited:

"*Affiants have received reliable information from a credible person and do believe* that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are

being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." (Emphasis supplied).

The second example cited is *Nathanson v. United States,* 290 U.S. 41, 44, 54 S.Ct. 11, 78 L.Ed. 159 (1933), in which the warrant application was even more nakedly conclusory:

Francis B. Laughlin has stated under his oath that *he has cause to suspect and does believe that* certain merchandise [which is then described] is now deposited and contained within the premises of J.J. Nathanson [with the address then being given].

(Emphasis supplied).

The final example of such a "bare bones" or purely conclusory application is *Giordenello v. United States,* 357 U.S. 480, 481, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), in which the self-evidently inadequate application recited simply:

That on or about January 26, 1956, at Houston, Texas in the Southern District of Texas, *Veto Giordenello did receive, conceal, etc., narcotic drugs,* to-wit: heroin hydrochloride with knowledge of unlawful importation; in violation of Section 174, Title 21, United States Code.

(Emphasis supplied). These were truly conclusory or "bare bones" applications. The phrase "bare-bones," however, is now in danger of jumping off the reservation. A "bare-bones" warrant means a warrant for which the application was merely conclusory, as in the three cases cited by *Leon.* It does not apply to every warrant that is simply inadequate.

These illustrative examples cited by *Leon* are indispensable guide posts if we are to keep the proliferating resort to this *Leon* exemption within manageable bounds. This third exemption was clearly intended to deal with warrant applications which were nothing beyond mere conclusions and was not intended to deal with fuller warrant applications that turned out, on further legal examination, to be somehow flawed.

It was this distinction between an application for a warrant that may lack a substantial basis (but is still eligible for the

good faith exception) and a purely conclusory application (which is not so eligible) that Judge Greene discussed in *Patterson v. State,* 401 Md. at 105, 930 A.2d 348.

*The application of the good faith exception does not hinge upon the affidavit providing a substantial basis* for determining the existence of probable cause. As Judge Motz, writing for the United States Court of Appeals, Fourth Circuit, noted:

*If a lack of a substantial basis also prevented application of the Leon objective good faith exception, the exception would be devoid of substance . . . .* This is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.

*U.S. v. Bynum,* 293 F.3d 192, 195 (4th Cir.2002).

(Emphasis supplied). See also *Greenstreet v. State,* 392 Md. at 679–80, 898 A.2d 961.

The growing problem, however, is that defendants are now pushing to squeeze every warrant application that lacks a substantial basis into this third *Leon* exemption. As Judge Motz pointed out in *United States v. Bynum,* however, an application that lacks a substantial basis is the good faith norm, not the rare exception to the norm. It is only the starting point for further analysis, not the end point. What creative defendants are now attempting to do, whenever a judge has made a legal mistake in issuing a warrant, is to seek to pose as the critical question, "Why should not a well-trained officer have been aware of that?" They would have the courts attribute to the police and demand of the police more than a modicum of legal sophistication. *Sheppard* and *Leon,* on the other hand, never did any such thing. Creative defendants, however, finding no support in *Sheppard* or *Leon,* sometimes seek such support in the linguistic accretions found on some of the glosses on *Sheppard* and *Leon.* This is bad history, even if it is effective advocacy.

The distinction between a bad warrant, on the one hand, and a warrant so transparently vacuous that no officer could conceivably rely upon it, on the other hand, has no where been more effectively stated than by Judge Thieme in *West v. State*, 137 Md.App. at 355, 768 A.2d 150:

> We decline appellant's invitation to search for a three-legged biped. *He cannot dismiss the applicability of Leon by raising the same contentions on which he relied regarding the invalidity of the warrant due to insufficient probable cause. The points appellant raises* regarding *Leon are the very reasons for which we found that the warrant was based on insufficient probable cause.* That is precisely why the *Leon* good-faith exception exists—it is applicable in cases like this where there is not quite enough probable cause to support the issuance of a warrant, but the warrant should nevertheless be upheld because the police officers relied upon it in good faith, pursuant to the standards articulated in *Leon*, supra. We point out to appellant that *there would be no need for exceptions to laws if the standards are the same for both the law and its exception.*

(Emphasis supplied).

Judge Greene has also given us the benefit of a thorough analysis of this third *Leon* exemption in *Patterson v. State*, 401 Md. at 106–110, 930 A.2d 348. One of the factors he refers to, quoting *Leon* itself at 468 U.S. at 926, 104 S.Ct. 3405, as precluding a holding that the good faith exception could not apply is that wherein "the application for the search warrant provided sufficient evidence to create disagreement among thoughtful and competent judges as to the existence of probable cause." 401 Md. at 109, 930 A.2d 348. That is precisely what we have in this case. Judge Campen thought that there was enough probable cause to issue the warrant. The suppression hearing judge thought that there was not. The members of this Court think that there was. What is the reasonable officer to do in such a case? The appellee, however, in order to forfend the good faith exception, would have Detective Jones second-guess us all. It was Judge Thieme in

*West v. State,* 137 Md.App. at 356, 768 A.2d 150, who explained why that cannot be.

In applying *Leon,* we must bear in mind the euthanasia of pure reason that would result from holding police officers in the field, usually having no legal education besides the one they ostensibly acquire while on duty, to a higher legal standard than we hold the issuing judge himself, who has legal training and has the benefit of an objective and neutral perspective. *It is the judge who possesses the legal acumen to objectively analyze the facts and render a decision as to the constitutionality of a search warrant.*

*The warrant contained enough details to allow the is-suing judge to make the determination that there was sufficient probable cause.* We further point out that the suppression hearing judge, although using a deferential standard of review, believed the information provided within the affidavit sufficed to establish a substantial basis of probable cause. Further along the chronology of this case, we point out that our determination that there was not a substantial basis of probable cause was arrived at through a great deal of research and analogy, not while on the battlegrounds of crime, but rather from an argu-ably more serene environment, with more time for ample reflection, and with access to seemingly limitless re-sources. *We certainly cannot hold the police officers in this case to a higher standard than we expect from our-selves or from the judges that became involved in this case prior to our review.*

(Emphasis supplied).

On our *de novo* review, not of the question of probable cause but of whether Judge Campen had a substantial basis for issuing the warrant, we have already held that he had and that the warrant was valid. *A fortiori,* Detective Jones would have been entitled to the good faith exception to the Exclusionary Rule. Even if the warrant had been for some technical reason invalid, it clearly was not so utterly bereft of merit as to invoke one of *Leon's* rare exemptions.

## Postlude:

## The Admissibility of Testimony Bearing
## On an Officer's Good Faith

There remains one final but small wrinkle of the case that is at least deserving of notice. At the suppression hearing, on the limited issue of the good faith exception, the State attempted to put Detective Jones on the stand to testify that during the execution of the controlled buy he had kept the CI under direct surveillance at all times. The suppression hearing court did not permit this testimony.

On the issue of whether there was a substantial basis for the initial issuance of the warrant, such a prohibition on any extrinsic evidence outside the four corners of the warrant application itself was clearly proper. On the distinct issue of Detective Jones's good faith, however, the situation is by no means so clear-cut. At least four federal circuit courts have held that in deciding whether an officer who executes what turns out to be an invalid warrant may claim the benefit of the good faith exception, the reviewing court may consider information known to the officer but not included in the application for the warrant. *United States v. Martin*, 297 F.3d 1308, 1318–20 (11th Cir.2002); *United States v. Marion*, 238 F.3d 965, 969–70 (8th Cir.2001); *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir.1996); *United States v. Owens*, 848 F.2d 462, 466 (4th Cir.1988).

Three other federal circuit courts, however, have ruled that on the issue of an officer's good faith, nothing may be considered that is not contained within the four corners of the warrant application. *United States v. Laughton*, 409 F.3d 744, 751–52 (6th Cir.2005); *United States v. Koerth*, 312 F.3d 862, 871 (7th Cir.2002); *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir.1988).

Under either of these divergent lines of authority, it would seem that the testimony proffered by the State would have been admissible. The difference between the two bodies of case law is really based on their respective points of view as to what the proper object should be of the police officer's good

faith. Ordinarily, the testimony in issue concerns some extraneous fact that is not to be found within the "four corners" of the application for the warrant. It consists of extraneous evidence supporting a finding of probable cause for the search.

The cases that allow such testimony to be received focus on the fact that the evidence helps to establish that the officer in good faith believed that probable cause existed to support the search. The cases that would disallow such testimony, by contrast, stress that the object of the good faith should be not the existence of probable cause to justify the search but rather the legal adequacy of the application to support the issuance of the warrant. In terms of the undergirding rationale of *Sheppard* and *Leon*—the reasonable deference of the officer to the judge as the basis of reasonableness—the latter position would appear far sounder.

In this particular case, however, the proffered testimony appeared to be more than merely extraneous evidence of probable cause. It seemed to go to the very heart of the warrant application itself. The proffered testimony that Detective Jones kept the CI under constant surveillance at all times went to the very meaning of the application's critical sentence, "An exchange took place." Officer Jones knew what he meant to say and what he genuinely thought he had said. His reading was one plausible reading of an otherwise ambiguous sentence. He, moreover, was the author of the sentence and knew what he was trying to say. If he believed and had reason to believe that his testimony simply reflected what his sentence actually meant, then he had a good faith belief in the adequacy of the warrant application itself. This was something far more than extraneous evidence of probable cause. It would seem to pass muster under either of the two lines of competing authority. Cf. *Valdez v. State*, 300 Md. 160, 168, 476 A.2d 1162 (1984); *Greenstreet v. State*, 392 Md. at 669–70, 898 A.2d 961.

## Conclusion

There was a substantial basis for the issuance of the warrant for either of two reasons. In the first place, there was a

permitted inference that the police surveillance of the controlled buy was uninterrupted and that alone constitutes a substantial basis for the issuance of the warrant. In the second place, even if, *arguendo,* there had been a gap in the surveillance, the independent police verification was still sufficient to satisfy the substantial basis standard. Our alternative holding is that, even if, *arguendo,* there had not been a substantial basis for the issuance of the warrant, the application was not so lacking as to preclude the application of the good faith exception to the Exclusionary Rule.

Accordingly, the decision we filed on January 10, 2008, directed that the order to suppress the physical evidence be vacated and that the case be remanded to the Circuit Court for Talbot County for a trial on the merits. Although our decision in this case was filed on January 10, 2008, it was at that time filed as unreported. For the sake of completeness, it seems appropriate to repeat its mandate here.

**SUPPRESSION RULING VACATED AND CASE REMANDED FOR A TRIAL ON THE MERITS; COSTS TO BE PAID BY APPELLEE.**