971 A.2d 379

Joseph ELLIS

v.

STATE of Maryland.

No. 637, Sept. Term, 2008.

Court of Special Appeals of Maryland.

May 11, 2009.

524

Andrew D. Levy (Gregory P. Care, Brown, Goldstein & Levy, LLP on the brief), for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: HOLLANDER, SALMON, and WOODWARD, JJ.

WOODWARD, J.

On February 7, 2007, appellant, Joseph Ellis, was indicted on charges of sexual abuse of a minor, sexual offense in the

fourth degree, sexual offense in the fourth degree by a person in a position of authority, indecent exposure, display of obscene material to a minor, and misuse of telephone facilities and equipment. The charges arose from the interactions between appellant, a high school teacher in Howard County, Maryland, and "S.S.", a 17 year old student at appellant's school. Before trial, the Circuit Court for Howard County denied appellant's motion to suppress, which challenged the validity of the search warrants used in the investigation. Immediately prior to trial, appellant pled guilty to display of obscene material to a minor. After a trial on the remaining counts, a jury found appellant guilty of sexual abuse of a minor, indecent exposure, and telephone misuse, and not guilty of both of the fourth degree sexual offenses. The circuit court sentenced appellant to a total of ten years' incarceration, with five years suspended and five years probation. This appeal followed.

Appellant presents three questions for our review, which we have rephrased: [1]

1. Did the circuit court err in denying appellant's motion to suppress?

2. Was there sufficient evidence to convict appellant of sexual abuse of a minor?

---

1. Appellant's questions, in the words of his brief, are:
 1. Did the affidavits in support of the applications for search and seizure warrants establish probable cause to issue the warrants and, if not, did the affiants' recklessness with facts preclude application of the "good faith" exception to the exclusionary rule, or, at a minimum, entitle the defendant to a *Franks* hearing?
 2. Was the defendant a "person who ha[d] permanent or temporary care or custody or responsibility for the supervision of a minor" where the consensual supervisory relationship between teacher and student had lapsed once school ended, there was a clear "temporal break in the teacher and student relationship," and there was no "school related activity immediately connected to the abuse?"
 3. Did the sentencing judge's repeated references to his own children and himself create the appearance that he was not impartial and disinterested?

3. Did the sentencing court err or abuse its discretion in sentencing appellant?

Finding no error, we affirm.

## BACKGROUND

The trial in the instant case occurred in January of 2008. The following is a summary of the evidence adduced at trial. In the Fall of 2006, appellant was a 25–year–old teacher of History and American Government at a high school in Howard County. During this time S.S., a 17–year–old senior at the school, and appellant began an increasingly friendly relationship. Although S.S. had been a student in one of appellant's classes the year before, she was currently neither a student in one of appellant's classes nor a participant in any extracurricular activity supervised by appellant.

In December of 2006, appellant gave S.S. his cell phone number and the two began communicating by text messages and phone calls. About the same time, S.S. and appellant began communicating on the computer by online instant messages. While at first innocent in tone, the communications became increasingly sexual, including references to appellant's sexual history and preferred sexual activities. Prior to the school's winter break, appellant emailed to S.S. six photographs, four of which were admitted into evidence. Two of the photographs admitted into evidence showed appellant's erect penis alongside a ruler. The other two photographs admitted into evidence showed an unidentified woman engaging in fellatio upon appellant. Appellant and S.S. later discussed the photographs via instant messaging.

In subsequent conversations, appellant indicated that he wanted to meet with S.S. at a park or hotel. One evening, in the course of communicating with S.S. by instant message, appellant noted that his penis was "better in person" and invited S.S. to visit him in his classroom the following day. The next day, S.S. arrived with a friend at appellant's classroom shortly after classes had finished for the day. The hallways of the school building at that time were almost

empty, with maybe one or two people walking by. While S.S.'s friend remained in the hallway, S.S. entered appellant's classroom, whereupon appellant told S.S. to look down where his penis was visible. When S.S. told appellant to put his penis back in his shorts, appellant grabbed S.S.'s hand and attempted to get her to touch his penis. S.S. did not touch appellant's penis and, instead, departed the classroom.

Upon returning to school in January of 2007 after the school's winter break, S.S. reported these events to a teacher and guidance counselor, and the police were contacted. On January 5, 2007, two Howard County Police Detectives went to S.S.'s home. There they confiscated S.S.'s cell phone and computer and persuaded her to place a recorded, one-party consent call to appellant. In the course of that call, appellant said, among other things, that he showed S.S. his penis because he "wanted [her] to look at it." Appellant was arrested later that day. On the same day, Howard County Police Detectives obtained and executed search warrants for appellant's residence and vehicle. On January 12, 2007, two additional search warrants were obtained for the contents of a laptop computer owned by the high school and used by appellant and for the contents of appellant's cell phone, which had been seized at the time of appellant's arrest.

On February 7, 2007, a grand jury returned a six-count indictment against appellant, alleging violations of Maryland Code Ann. (2002, Supp.2008), Criminal Law Article ("CR") § 3–602 (Sexual abuse of a minor), § 3–308(b) (Sexual offense in the fourth degree), § 3–308(c) (Sexual offense in the fourth degree—sexual abuse of a minor student by a person in a position of authority), § 11–107 (Indecent exposure), § 11–203(b)(1) (Display of obscene material to a minor), and § 3–804(a) (Misuse of telephone facilities and equipment).

On March 15, 2007, appellant filed a motion to suppress the evidence seized pursuant to the search warrants issued on January 5, 2007, and the additional warrants issued on January 12, 2007. On July 9, 2007, a search warrant was obtained to examine the three computers seized from appellant's resi-

dence, as well as the laptop computer (which had not been forensically examined as directed by the January 12, 2007 warrant). At the hearing on the motion to suppress on October 31, 2007, the State introduced three of the search warrants: (1) the January 5, 2007 search warrant for appellant's residence, (2) the January 12, 2007 search warrant for the contents of appellant's cell phone, and (3) the July 9, 2007 search warrant for the contents of the four computers. The State proffered that only evidence recovered pursuant to those warrants would be utilized in the prosecution of appellant. Appellant amended his motion orally to include the July 9, 2007 search warrant. At the conclusion of the hearing, the circuit court denied appellant's motion to suppress.

Prior to trial, appellant pled guilty to the charge of displaying obscene material to a minor. Appellant was tried on the remaining charges on January 7–9, 2008. At the conclusion of the trial, the jury found appellant guilty of sexual abuse of a minor, indecent exposure, and telephone misuse, and not guilty of the fourth degree sexual offenses. On April 25, 2008, the circuit court sentenced appellant to three years' incarceration for indecent exposure, a consecutive one year term for telephone misuse, a consecutive one year for display of obscene material to a minor, and ten years for sexual abuse of a minor, the last to run concurrent with the other sentences, with five years suspended and five years probation. This timely appeal followed.

## DISCUSSION

### I.

### The Warrants

Appellant argues that the circuit court erred in denying his motion to suppress the photos and other evidence garnered from appellant's computers and cell phone, which were seized pursuant to search warrants signed by a district court judge. Appellant contends that the affidavits, upon which the search warrants were based, failed to provide a substantial basis for a

finding of probable cause. In particular, appellant complains that the warrants contained inapplicable boilerplate language regarding child pornographers, failed to state how the victims knew that they were communicating with appellant, and failed to state the dates of the alleged crimes.[2]

## Standard of Review

The rubric that we use to review a defendant's challenge to a search warrant, and the evidence seized and utilized as a result, is well established. We begin with the language of the Fourth Amendment, which states that " 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized'; [and which] is applicable to the states by the [F]ourteenth [A]mendment." *Birchead v. State,* 317 Md. 691, 700, 566 A.2d 488 (1989) (quoting *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). "Probable cause means a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " *Ferguson v. State,* 157 Md.App. 580, 592, 853 A.2d 784 (2004) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

"When making a probable cause determination, the issuing court is confined to the averments contained in the search warrant application." *Ferguson,* 157 Md.App. at 592, 853 A.2d 784. Our review of the issuing court's decision is

---

**2.** Appellant also contends that the warrants were not subject to the "good faith exception" because the affiants were reckless with the facts of the investigation. Finally, appellant contends that the police recklessly presented him as a pedophile and, as a result, appellant is entitled to at least a *Franks* hearing. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). As explained *infra,* our holding that there was a substantial basis for a finding of probable cause obviates the necessity of addressing these contentions.

equally confined to the contents of the application and affidavit:

> When reviewing the basis of the issuing judge's probable cause finding, we ... confine our consideration of probable cause solely to the information provided in the warrant and its accompanying application documents. We do not consider evidence that seeks to supplement or controvert the truth of the grounds advanced in the affidavit. This principle is known as the "four corners rule."

*Greenstreet v. State,* 392 Md. 652, 669, 898 A.2d 961 (2006) (citations omitted).

　██ "When reviewing the judge's decision to issue a search warrant, we do not undertake a *de novo* review, but, instead, pay great deference to the magistrate's determination." *Ferguson,* 157 Md.App. at 592–93, 853 A.2d 784. We recently stated that the "difference between a *de novo* appraisal of a warrant itself and the more deferential appraisal of the warrant-issuing judge's decision to issue the warrant" is crucial to our review of search warrants. *State v. Jenkins,* 178 Md.App. 156, 163, 941 A.2d 517 (2008).

> "We determine first whether the issuing judge had a substantial basis to conclude that the warrant was supported by probable cause. **We do so not by applying a *de novo* standard of review, but rather a deferential one.** The task of the issuing judge is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search. **The duty of a reviewing court is to ensure that the issuing judge had a 'substantial basis for ... conclud[ing] that probable cause existed.'** "

*Id.* (quoting *Greenstreet,* 392 Md. at 667–68, 898 A.2d 961) (citation omitted) (emphasis and alterations in original).

　██ "[T]he more deferential substantial-basis standard govern[s] judicial review generally, *nisi prius* suppression hearing courts and appellate courts alike." *Jenkins,* 178 Md.App. at 163, 941 A.2d 517. "In a review posture such as the present

one, the deference that is owed by us is to the warrant-issuing judge, just as the deference of the suppression hearing judge was owed to the warrant-issuing judge." *Id.* at 170, 941 A.2d 517. "As a practical matter, that means that, at the very least, we will accept [the issuing judge's] implicit fact-finding, unless clearly erroneous, and, beyond that, we will view the factual recitations in the warrant application in the light most favorable to the State." *Id.* at 174, 941 A.2d 517.

" 'The U.S. Supreme Court explained in *Gates* that the purpose of this standard of review is to encourage the police to submit to the warrant process.' " *Id.* at 163, 941 A.2d 517 (quoting *Greenstreet*, 392 Md. at 667–68, 898 A.2d 961).

> Extending great deference to the magistrate's decision acts as a means of encouraging the police to submit to the warrant process. A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner. Furthermore, in cases wherein it is not easy to determine whether the affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*Ferguson*, 157 Md.App. at 593, 853 A.2d 784 (citations and quotations omitted).

## The Applications and Affidavits

In the instant case, the police applied for and were granted search warrants in order to search appellant's residence, vehicle, cell phone, laptop computer, and computers seized from appellant's residence. The affidavits in support of the search warrants were prepared by Detective Michael Brady (affidavit regarding appellant's vehicle, residence, and cell phone), Detective Denise Francis (regarding the laptop computer), and Corporal Eric Kruhm (regarding the computers seized from appellant's residence and the laptop computer).

Each application and affidavit followed substantially the same form. The application and affidavit prepared by DFC Brady regarding appellant's residence is representative, and includes the language and passages that appellant complains about in this appeal. For the purpose of our analysis, we will examine that application and affidavit.

The application began with a statement indicating that the applicant had "reasonable grounds (probable cause) to believe that on or in the ... described premises ... is evidence in relation to the commission of the following crime(s), to wit:" CR §§ 3–601 (child abuse), 3–324 (solicitation of minor), and 3–308 (sexual offense in the fourth degree). The affidavit, in turn, began with a statement identifying the affiant, DFC Brady, and his rank, assignment, investigative duties, law enforcement background, training background, educational attainment, and history of giving sworn testimony. The affidavit then set forth the following summary of the investigation by police:

On January 5, 2007 Detectives, at the Child Advocacy Center, received a sexual child abuse case occurring in Howard County. The nature of the case initially involved three juvenile female victims that attend [ ] High School. Each victim is under the age of 18 years old. In the initial report received from the school each victim advised that they had received text messages from a teacher at the school, identified as Joseph Samuel Ellis (W/M DOB: 4/19/81). One Victim stated that she had received text messages and instant messages of a sexual nature. The second victim advised that Ellis made sexually inappropriate comments to her such as, "your breasts looked really nice in that shirt today." The third victim stated that Ellis had sent her nude pictures, through email, of himself and a female subject whom she believes to be Ellis' fiancé that is also a teacher in another school. That victim also stated that Ellis has exposed his penis to her and also grabbed her hand and attempted to get her to touch his penis.

DFC Brady conducted several computer checks on Ellis. The Motor Vehicle Administration check revealed that Ellis

lives at ... Columbia, Howard County, Maryland. That check also revealed that Ellis does not have any vehicles registered in his name. A further check provided that Ellis did not have a criminal history nor did he have any significant local history.

On January 5, 200[7] at approximately 1200 hours DFC Branch, DFC McDaniel, and S/W Biter responded to [ ] High School to interview the victims in this case. The first victim in this case, referred to as victim # 1, provided the following information:

- She stated that she received text messages, from Ellis via cellular telephone, in reference to "hooking up" and meeting somewhere.
- She stated that she had email correspondence with Ellis.
- She stated that during that correspondence she received pictures of Ellis' penis, Ellis' penis inside a female subject, Ellis' penis and a ruler, and a female subject giving Ellis oral sex.

The second victim, referred to as victim # 2, provided the following:

- She stated that Ellis sent her text messages, via cellular telephone, of a sexual nature.
- She stated that in those messages Ellis stated that she looked hot and her shirt made her breasts look good.
- She stated that she met Ellis over the summer at a park, in Columbia, Howard County, Maryland, where he "felt her up" on her breasts and vagina over her clothes.
- She stated that Ellis told her he would buy alcohol for her.
- She stated that she communicated with Ellis through "IMing" (Instant Messaging) and over the phone.

The third victim, referred to as victim # 3 provided the following:

- She stated that she never gave Ellis her cell phone number.
- She stated that she talked to Ellis over the computer by IM's and that the IM's were of a sexual nature.

- She stated that she had exchanged IM's with Ellis last year and a few weeks ago.

- She stated that she only talked to Ellis over the computer.

All three victims are under the age of 18, attend [ ] High School, and the suspect is a teacher at [ ] High School.

The affidavit went on to include 18 paragraphs of boilerplate information about child pornographers and their habits, particularly concerning their use of computers. The affidavit then proceeded to discuss, in 10 paragraphs, the use of computers in crime more generally. The affidavit concluded by specifying the place to be searched, and included a list of items to be seized.

### Appellant's Allegations of Error

Appellant's first contention is that "[i]n the affidavits for the warrants in this case, the officers set forth lengthy, yet completely unsupported, conclusions that [appellant] fit the profile of a 'child pornographer' and 'preferential child molester.'" Moreover, according to appellant, "there is nothing in the affidavits from which to conclude that the affiants had any special training in the specialized field of child sex offenses to support their conclusory statements regarding their knowledge of the habits of child pornographers and preferential child molesters."

The short answer to this contention is that the suppression court agreed with appellant and excluded "the child sex offense boiler plate language" in making its determination of whether there was a substantial basis for the issuing judge to conclude that probable cause existed.[3] The suppression court reasoned:

[T]here's a boiler plate language as it relates to investigation of child sex offenses in general, and I'm using that as a

---

3. Appellant does not contend that the mere presence of the offending boilerplate language in the affidavits is sufficient to invalidate the warrants, even if the remaining facts support a finding of probable

general term, because [defense counsel is] absolutely correct, there's—this is not a pedophile case. If you look at the ages of the girls involved, it is not a pedophile cases. . . . I find that the investigation of child sex offenses is a specialized field, it's a field in which there has to be special training and special education. I see no evidence that there's significant training in it and I have no knowledge and have no reason to believe that there is a—any significant training in the field of child sexual—investigating child sexual offenses, as part of the more standard police training and standard police experience, nor is there gaining that type of information through your standard life experience.

And in this case, Detective Brady makes a conclusory statement that he has this training and I think it's at glaring odds with how other affiant's have handled this situation.

And for that reason I'm gonna find that the—there's an insufficient showing, within the four corners of the warrant, to support the use of the child sex offense boiler plate language in making a determination of probable cause.

■ Contrary to appellant's contention, nowhere in the affidavit was appellant described as a child pornographer or preferential child molester. The boilerplate language described the known habits of child pornographers and preferential child molesters in general, without any reference to appellant. Although the implication of the boilerplate language being included in the affidavit was that the police suspected appellant of being a child pornographer or molester, such implication is clearly at odds with the stated facts of the investigation and the crimes charged. Therefore, the suppression court was eminently correct in striking the boilerplate language concerning child sex offenses and reviewing the affidavits on the remaining facts as they were set forth.

---

cause. We know of no authority supporting such contention. *Cf. Holmes v. State,* 368 Md. 506, 517, 796 A.2d 90 (2002) (stating that if tainted information included in the warrant application can be excised and the application suffices to establish probable cause without reference to that information, the challenged evidence would be admissible as properly seized under the warrant).

██ Appellant's second argument is that "the affidavits allege no facts supporting probable cause to seize the computers from [appellant's] home." In support of this contention, appellant argues that "the [victims] did not say how they knew they were corresponding with [appellant]" when using emails and instant messaging. Finally, appellant argues that the "affidavits are . . . constitutionally deficient because they lack any information as to *when* the events alleged therein transpired." (Emphasis in original). We reject both arguments.

The facts articulated in the representative affidavit set forth above demonstrated that the victims were communicating with appellant through cell phone text messages and computer-based emails and instant messages, *in addition to in-person* communications with appellant. Thus this case is not one in which the victims interacted only through faceless, anonymous communications over the internet with a stranger. The victims here were students at the high school where appellant taught, and two of the students alleged crimes of a sexual nature by appellant as part of, or connected with, the communications between appellant and the victims. The affidavit, therefore, contained sufficient evidence, as appellant puts it, to establish "probable cause to believe that [appellant] was actually the person communicating with" the victims. There was also sufficient evidence in the affidavit to make the reasonable inference that, in the course of the emails and instant messages between appellant and the three victims, appellant utilized his personal computer in his home and that evidence of those communications would remain on that computer as evidence.

██ Although the facts of the investigation as recounted in the affidavit are not replete with specific dates of the alleged incidents, the affidavit was *not*, as appellant claims, "devoid of any facts as to the date or time of any of the alleged events described by the witnesses." The affidavit reasonably described a relatively recent and ongoing course of communications between appellant and the victims. In particular, victim #2 referred to a meeting with appellant "over the summer," which can be read as a reference to the summer of 2006, just

four to six months prior to the affidavit. Victim # 3 "stated that she had exchanged IM's with [appellant] last year and *a few weeks ago*," indicating that communications described had occurred recently. To demand particular dates for each incident would be "hypertechnical" and contrary to a common-sense reading of the affidavit. Therefore, there was sufficient information to "permit a proper staleness inquiry."

 We conclude that the suppression court did not err in its determination that the information contained in the search warrants and accompanying application documents, excluding the offending boilerplate language, articulated a substantial basis for the issuing-judge to conclude that probable cause existed to search the places and items specified in the warrants for evidence of the crimes alleged.[4]

## II.

### A Person Who Has Responsibility for the Supervision of a Minor

Appellant argues that the trial court erred in refusing to grant his motion for judgment of acquittal on the charge of

---

4. Because we conclude that the warrants in the instant case were valid, we do not reach the issue of whether the "good faith" exception to the exclusionary rule was applicable. *See McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997) (noting that "[t]he United States Supreme Court in [*United States v.]Leon*[468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)] modified the Fourth Amendment's exclusionary rule to provide that evidence seized under a warrant *subsequently determined to be invalid* may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." (Emphasis added).).

 Nor do we reach the issue of whether appellant is entitled to a *Franks* hearing. As appellant noted in his brief, the *Franks* Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and *if the allegedly false statement is necessary to the finding of probable cause,* the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155-56, 98 S.Ct. 2674 (emphasis added). In the instant case, even if the offending boilerplate language can be characterized as a "false statement" and not merely unsupported background, such language was *not* necessary to the finding of probable cause, and, therefore, appellant is not entitled to a *Franks* hearing.

sexual abuse of a minor in violation of CR § 3–602.[5] According to appellant, "[t]he evidence was insufficient for want of proof that [appellant] was a 'person who has permanent or temporary care or custody or responsibility for the supervision of a minor[,]' " under CR § 3–602(b)(1). In particular, appellant contends that appellant's supervision of S.S. ceased after the school day ended, that there was a temporal break in the supervisory relationship between appellant and S.S., and that the alleged abuse was not "immediately connected" to a school activity. We disagree and explain.

"The standard for determining whether there is sufficient evidence to support a conviction 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Anderson v. State,* 372 Md. 285, 291–292, 812 A.2d 1016 (2002) (quoting *Burch v. State,* 346 Md. 253, 272, 696 A.2d 443 (1997)). "Whether a person has responsibility for the supervi-

---

5. CR § 3–602 provides, in pertinent part:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Family member" has the meaning stated in § 3–601 of this subtitle.

(3) "Household member" has the meaning stated in § 3–601 of this subtitle.

(4)(i) "Sexual abuse" "means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not."

(ii) "Sexual abuse" includes:
 1. incest;
 2. rape;
 3. sexual offense in any degree;
 4. sodomy; and
 5. unnatural or perverted sexual practices.

(b) *Prohibited.*—(1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor.

(2) A household member or family member may not cause sexual abuse to a minor.

(c) *Penalty.*—A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 25 years.

sion of a minor child in contemplation of Art. 27 § 35C,[6] is a question of fact for the jury." *Id.* at 292, 812 A.2d 1016.

CR § 3–602(b)(1) states, in relevant part, that any person who has "responsibility for the supervision of a minor may not cause sexual abuse to the minor." When the child abuse statute was originally enacted in 1963, the class of persons to whom the statute applied was limited to "[a]ny parent, adoptive parent or other person who has the permanent or temporary care or custody of a minor child." Act of Apr. 30, 1963, ch. 743, 1963 Md. Laws 1536. Several years later, the General Assembly expanded the class of persons subject to the statute to any person who has "responsibility for the supervision of a minor child." Act of Apr. 29, 1966, ch. 221, 1966 Md. Laws 466.

The meaning of this statutory language, however, was not addressed by the Court of Appeals until 1979 in the case of *Pope v. State,* 284 Md. 309, 396 A.2d 1054 (1979). In *Pope,* the Court first observed:

> The child abuse statute speaks in terms of a person who "has" responsibility for the supervision of a minor child. It does not prescribe how such responsibility attaches or what "responsibility" and "supervision" encompass. A doubt or ambiguity exists as to the exact reach of the statute's provision with respect to "has responsibility for the supervision of," justifying application of the principle that permits courts in such circumstances to ascertain and give effect to the real intention of the Legislature.

*Id.* at 322, 396 A.2d 1054.

The Court went on to ascertain the intent of the Legislature in adopting the subject language in the child abuse statute:

> [W]e think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally

---

**6.** Article 27, § 35C(b) is the predecessor statute to CR § 3–602(b)(1). The statutory language relevant to the case *sub judice* is substantially the same in these two sections.

charged with the care of the child and by the one assuming the responsibility. In other words, a parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third person may not assume such responsibility unless the parent grants it. So it is that a baby sitter temporarily has responsibility for the supervision of a child; the parents grant the responsibility for the period they are not at home, and the sitter accepts it. **And it is by mutual consent that a school teacher has responsibility for the supervision of children in connection with his academic duties.**

*Id.* at 323–24, 396 A.2d 1054 (emphasis added).

Finally, the Court discussed the duration of the responsibility for the supervision of a minor once that responsibility has been placed in a third person:

On the other hand, once responsibility for the supervision of a minor child has been placed in a third person, it may be terminated unilaterally by a parent by resuming responsibility, expressly or by conduct. The consent of the third party in such circumstances is not required; he may not prevent return of responsibility to the parent. **But, of course, the third person in whom responsibility has been placed is not free to relinquish that responsibility without the knowledge of the parent. For example, a sitter may not simply walk away in the absence of the parents and leave the children to their own devices.**

*Id.* at 324, 396 A.2d 1054 (emphasis added).

In *Anderson,* the Court of Appeals was faced with the same question as is presented in the instant appeal: whether the evidence was sufficient to establish that the petitioner, a high school teacher, was a person having temporary responsibility for the supervision of a minor, a student, within the meaning of the child abuse statute. 372 Md. at 287, 812 A.2d 1016. In *Anderson,* the victim was a fourteen-year-old girl who was a student at the high school where the petitioner taught. *Id.* at 288, 812 A.2d 1016. The victim was not in any of the

petitioner's classes, nor was she in any extracurricular activity run by petitioner. *Id.* The victim met the petitioner through one of her teachers, Ms. Riggs. *Id.* The petitioner would come into Ms. Riggs' classroom where the victim helped out after school, and the petitioner would occasionally help the victim with math problems. *Id.*

The incident giving rise to the criminal prosecution of the petitioner occurred on the last day of the school year, June 9, 2000. *Id.* at 289, 812 A.2d 1016. The school day ended at noon and the victim stayed after school with Ms. Riggs to help her with her room. *Id.* The petitioner met the victim, Ms. Riggs, and Ms. Riggs' daughter in the hallway and invited them to lunch. *Id.* All four left the school property in the petitioner's car, had lunch at a nearby McDonald's restaurant, and returned to school about one-half hour later. *Id.* The victim then resumed helping Ms. Riggs with her room. *Id.* The petitioner asked the victim if she wanted a ride home; she agreed; and sometime after 2:00 p.m. the petitioner and the victim left the school in the petitioner's car. *Id.* When driving the victim home, the petitioner invited the victim to his house to play a game of pool, and when she accepted, the petitioner drove her to his house. *Id.* There the petitioner and the victim had sexual intercourse. *Id.* at 290, 812 A.2d 1016.

The petitioner was convicted of child abuse under Article 27, § 35C, the predecessor to CR § 3–602, and his conviction was affirmed by this Court in a reported opinion, *Anderson v. State,* 142 Md.App. 498, 515, 790 A.2d 732 (2002).

Before the Court of Appeals, the petitioner contended that the evidence was insufficient to sustain his conviction because a necessary element of the child abuse statute was missing, namely, he was not "a parent, household or family member or other person who has permanent or temporary care or custody *or responsibility for supervision of a child.*" *Id.* at 290–91, 812 A.2d 1016 (emphasis added). The petitioner, however,

acknowledge[d] that a teacher is responsible for the supervision of a child at those times and places where he or she is acting as a teacher and that **when the teacher is at school**

or is with a student off school premises for a school related activity, he "has responsibility for supervision as part of his job." He recognize[d] that these circumstances would fit within the notion of implied mutual consent between the parent and the school authorities.

*Id.* at 291, 812 A.2d 1016 (emphasis added). In other words, the petitioner admitted "that he had responsibility for the supervision of the victim, by mutual consent, while they were at school, or were involved in school related activities." *Id.* at 293, 812 A.2d 1016.

The petitioner argued to the Court that "when a teacher is with a student off school grounds, for a non-school related activity, the implied consent rationale is inapplicable," *id.* at 291, 812 A.2d 1016, and accordingly, when he and the victim left the school, the implied mutual consent that existed as a result of his position as a teacher ended, and he no longer had responsibility for the victim's supervision. *Id.* at 294, 812 A.2d 1016. The Court rejected this argument. *Id.*

The Court first reiterated the petitioner's acknowledgment that he had responsibility for the victim's supervision at school. *Id.* at 295, 812 A.2d 1016. Similarly, according to the Court, the victim's mother "entrusted [the victim] not to a particular teacher for a particular activity, *but to the school as a whole for the entirety of the school day.*" *Id.* (emphasis added). The Court reasoned further:

The victim's mother terminated the responsibility of the school, and by extension the teachers, on the days she came to get her daughter or gave her daughter permission to ride the bus. On the day in question, however, the mother never resumed responsibility expressly or by conduct. Instead, the responsibility remained in the teacher who held it and voluntarily extended it through his offer of transportation. He took it upon himself to transport her home from school and made those arrangements with her at school and during school hours. Petitioner's "official" supervisory interactions with the victim that began at school, his transportation of her that was initiated at school, and his sexual involvement

with her "together constituted an indivisible, ongoing relationship."

*Id.* at 295–96, 812 A.2d 1016 (footnote omitted).

Finally, the Court rejected the petitioner's assertion that he was not "with the child off school grounds for an activity related to academic or a school related extracurricular activity." *Id.* at 296, 812 A.2d 1016. The Court stated that "[i]t is the school related activity immediately connected to the abuse, in this case the transportation of the student home from school, that provides the basis of supervision." *Id.* Therefore, the Court held that the "evidence was sufficient for the trier of fact to find beyond a reasonable doubt that petitioner was a person who had responsibility for the supervision of a minor child as contemplated by Art. 27, § 35C." *Id.* at 297, 812 A.2d 1016.

 We can discern from *Pope* and *Anderson* that implied mutual consent exists between a parent and school authorities whereby the school, and by extension all of the teachers, assumes the temporary supervision of the child for the entire school day, which does not end until the child leaves the school grounds in accordance with the express or implied permission of the parent, *e.g.,* riding a school bus, walking home, or catching a ride with another student. The ringing of the school bell that denotes the end of classes cannot terminate the responsibility of the school for the students on the school premises, because it would be unreasonable to suggest that, when a parent entrusts a child to a school, such parent does not impliedly consent to the school's continued duty to ensure the safety of the child until the child leaves the school premises for the day. Moreover, under the teachings of *Pope,* the school is not free to relinquish the supervisory responsibility that it assumed when the child entered upon the school grounds on a school day without the knowledge of the parent. *See Pope,* 284 Md. at 324, 396 A.2d 1054.

The above principle clearly undergirded the opinion of the Court of Appeals in *Anderson.* The Court repeatedly referred to the acknowledgment by the petitioner that he, as a

teacher, "had responsibility for the supervision of the victim, by mutual consent *while they were at school.*" *Anderson,* 372 Md. at 293, 812 A.2d 1016 (emphasis added). This responsibility, according to the Court, was voluntarily extended by the petitioner through his offer to transport the victim home from school, which offer was made to the victim when they were at school approximately two hours *after* classes had ended. *Id.* at 289, and 295 n. 3, 812 A.2d 1016. As Judge, now Chief Judge, Krauser wrote in this Court's opinion in *Anderson,* 142 Md.App. 498, 510, 790 A.2d 732 (2002), the petitioner's "offer to give the child a ride home was made on school premises *while the child was still under the supervision of [the petitioner].*" (Emphasis added).

In the case *sub judice,* the sexual abuse occurred when appellant and S.S. met in his classroom about five to ten minutes after the bell had rung ending classes for the school day. The implied mutual consent for the school and its teachers, including appellant, to assume temporary responsibility for the supervision of S.S. when she arrived for school that day continued through the time period of the meeting between S.S. and appellant in appellant's classroom after classes had ended. Such meeting occurred prior to S.S. leaving the school premises in the manner approved by her parents, to wit, driving her own car home from school.

Contrary to appellant's argument, there was no "temporal break" in the teacher-student relationship between appellant and S.S. As previously stated, the supervisory responsibility of the school and its teachers over the students does not end when classes are over for the day. Consequently, appellant's assertion that the "mutual implied consent for [appellant] to generally supervise [S.S.] ... had certainly terminated after school hours" is incorrect. In addition, appellant contends that a "temporal break" occurred because S.S. "was not a student in any of [appellant's] classes, and had not been one since the previous academic year, nor was she a participant in any school activity he coached or advised." This contention is refuted by *Anderson.* There, the petitioner never had the

victim as a student or a participant in any extracurricular activity that he ran and got to know her only by visiting the classroom of another teacher. *Anderson,* 372 Md. at 288, 812 A.2d 1016. Moreover, on the day of the sexual abuse, the victim was not involved in any school activity supervised by the petitioner. *Id.* at 289, 812 A.2d 1016. Yet, the Court of Appeals determined that when the petitioner, while at school, offered to give the victim a ride home, " 'the child was still under the supervision of [the petitioner].' " *Id.* at 294, 812 A.2d 1016 (quoting *Anderson,* 142 Md.App. at 510, 790 A.2d 732).

Finally, appellant argues that "no rational trier of fact could find beyond a reasonable doubt that there was any 'school related activity immediately connected to the [alleged] abuse' in this case. *Anderson,* 372 Md. at 296, 812 A.2d 1016." The assumption underlying this contention is that *Anderson* requires that the alleged abuse be immediately connected with a "school related activity" under the circumstances of this case. We disagree.

In the instant case, the sexual abuse occurred on school grounds on a school day. The phrase "school related activity" was used by the Court of Appeals in *Anderson* only in connection with a teacher's conduct with a student "off school grounds." *See* 372 Md. at 291, 293, 812 A.2d 1016 (stating that "a teacher is responsible for the supervision of a child ... when the teacher is at school *or* is with a student off school premises for a school related activity;" and the petitioner "had responsibility for the supervision of the victim by mutual consent, while they were at school *or* were involved in school related activities." (Emphasis added)). The Court said that a parent entrusts a child "not to a particular teacher for a particular activity, but to the school as a whole for the entirety of the school day." *Id.* at 295, 812 A.2d 1016. Consequently, a teacher has responsibility for the supervision of a child during a school day on school grounds regardless of whether they are involved in a "school related activity."

For the foregoing reasons, we hold that the evidence was sufficient for the jury to find beyond a reasonable doubt that appellant was a person who had responsibility for the supervision of a minor within the meaning of CR § 3–602(b)(1).

## III.

### Sentencing

Appellant contends that the circuit court judge, at sentencing, made repeated references to his own children and himself, and, in so doing, created the appearance that he was not impartial and disinterested, tainting the sentencing with passion, ill-will, prejudice, or the consideration of impermissible factors. Specifically, appellant argues that the sentencing judge's comments indicated that the judge was improperly relying on "the judicial equivalent of ... the Golden Rule" argument, which was indicated by the judge's "initial specific reference to his own children ... [and] the way it was followed by references that directly linked it to the facts of this case, such as the reference[ ] to the 'struggle' of 'parents in Howard County' and how 'we raise our children.' "

As a preliminary matter, the State contends that appellant's argument has not been preserved for our review. We note that a timely objection is required to prevent waiver of a defendant's claim that the sentencing judge relied upon impermissible sentencing considerations. *Reiger v. State,* 170 Md.App. 693, 700–01, 908 A.2d 124 (2006), *cert. denied,* 397 Md. 397, 918 A.2d 469 (2007). In the instant case, appellant failed to object during or after the court's announcement of appellant's sentence, and appellant thereby failed to preserve this issue for appellate review. Even if the issue had been preserved, appellant would not have prevailed. We explain.

Our standard of review for sentencing proceedings was clearly set forth by the Court of Appeals in *Jackson v. State,* 364 Md. 192, 772 A.2d 273 (2001):

It is well settled that a judge is vested with very broad discretion in sentencing criminal defendants. However, a

judge should fashion a sentence based upon the facts and circumstances of the crime committed and the background of the defendant, including his or her reputation, prior offenses, health, habits, mental and moral propensities, and social background. The judge is accorded this broad latitude to best accomplish the objectives of sentencing— punishment, deterrence and rehabilitation. It is also well settled that only three grounds for appellate review of sentences are recognized in this State: (1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) **whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations;** and (3) whether the sentence is within statutory limits.

*Id.* at 199–200, 772 A.2d 273 (quotations, alterations, and citations removed) (emphasis in original). In the case *sub judice,* as in *Jackson,* "[t]he first and third grounds are not applicable ...; however, the issue before us involves the second ground—whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations." *Id.* at 200, 772 A.2d 273.

In considering the second ground, we examine the record to determine whether "the sentencing judge was motivated by impermissible considerations reflecting ill-will or prejudice," or whether "his comments might lead a reasonable person to infer that he might have been motivated by ill-will or prejudice." *Id.* at 207, 772 A.2d 273. We do so because "a defendant 'has a right to a trial in which the judge is not only impartial and disinterested, but who also has the appearance of being impartial and disinterested.'" *Id.* (quoting *Chapman v. State,* 115 Md.App. 626, 631, 694 A.2d 480 (1997)). "'If a judge's comments during sentencing could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion.'" *Id.* (quoting *State v. Pattno,* 254 Neb. 733, 579 N.W.2d 503, 509 (1998)).

Furthermore, the Court of Appeals has stated that

a defendant's sentence should be individualized to fit the offender and not merely the crime. Consequently, [a] defendant's sentence should be premised upon both the facts and circumstances of the crime itself and the background of the individual convicted of committing the crime.

*Jennings v. State*, 339 Md. 675, 683, 664 A.2d 903 (1995) (citations and quotations omitted). Consistent with this goal,

permitting the trial court to base its sentence on perceptions . . . derived from the evidence presented at the trial, the demeanor and veracity of the defendant gleaned from his various court appearances, as well as the data acquired from such other sources as the presentence investigation or **any personal knowledge the judge may have gained from living in the same community as the offender is perfectly acceptable.**

*Id.* at 684–85, 664 A.2d 903 (emphasis added) (alterations in original) (quotation omitted).

 In the instant appeal, appellant complains about three brief passages from the trial judge's remarks. We begin by noting that we do not review these comments in isolation; rather, we review the entirety of the judge's comments at sentencing and consider the challenged comments in that context. *Henry v. State*, 273 Md. 131, 150, 328 A.2d 293 (1974). In the instant case, the sentencing proceeding lasted approximately six hours and included the testimony of three witnesses, a statement by the defendant, and argument by the attorneys. At the conclusion of the proceeding, and prior to the imposition of sentence, the trial judge made extensive remarks that covered almost ten pages of the trial transcript. The judge noted the solemnity of the occasion, his own past as a prosecutor and defense attorney before becoming a judge, the impact of appellant's acts on appellant's family and friends, the many letters received on appellant's behalf, the testimony of the expert witnesses at the sentencing hearing, the evidence presented at trial, and the victim's impact statement. The remarks, as a whole, reflect the judge's thoroughness, balance, and thoughtfulness. Throughout his remarks, the judge bal-

anced his comments, obviously considering the impact of the crime and prosecution of the crime on the victim and victim's family, as well as on appellant and appellant's family.

In our view, appellant parses out the judge's comments to create an argument that ignores the context of those comments. In context, the statements that appellant complains about simply do not show that the trial judge was motivated by ill-will, prejudice, or any other impermissible consideration, nor do those statements give the appearance that the trial judge was not impartial or disinterested. We explain.

 The first passage cited by appellant focuses on the judge's mention of his own children. Looking at the words of the judge cited by appellant, and those words just beyond those cited by appellant, makes clear the empathy of the judge toward the parents of both the victim *and appellant.* The Court began its remarks:

> *[Defense counsel], in his opening comments in closing said that we are all tired, and well, it is 9:30 [p.m.], certainly I am tired, but more than that I am sad. I am sad to be here. I have kids, I have a boy who is—I have three of them. I have a boy who is twenty-two, I also have a girl who is fifteen, I can—I am not going to try to say I can feel what the parents must feel because I cannot.* To have a son that you have seen grow and do wonderful things, wonderful things with his life, and to be in this position. Or to have a daughter, who has a life ahead of her, and an important year to complete, and have this happen.

(Italicized portion cited by appellant).

In considering the entirety of the trial judge's remarks, we see no evidence that the judge improperly relied on his own position as a father. Nor do we see evidence that the judge gave the appearance that he relied on his own fatherhood in determining appellant's sentence. The judge began his remarks with a reference to the fact that he is a father. It is clear that he did so to communicate his empathy for the parents of S.S. and appellant. The judge never again specifically mentioned himself or his children. It is simply not the

case, as appellant claims, that the judge made "repeated references to his own children and himself." ·

The second and third passages complained of are, in context, as follows:

The events in this case, constitute a lot of things. Betrayal is a word that easily comes to mind. [Appellant] betrayed his fiancé in many, many unimaginable ways. He betrayed his family. He betrayed the forty wonderful people, wonderful people who wrote him letters in support in some way, shape, or form. *And he betrayed the trust that was placed in him when he became a school teacher in the Howard County Public School System, and in doing that he betrayed every citizen in this county, particularly those parents who send off their children every day.*

\* \* \*

*Parents in Howard County struggle, and they hope and they pray for their children. And they send them to school. You send them there to learn academics, to learn their civics, to learn positive social lessons. We send them there expecting them to be safe, because school is a safe zone. When we raise our children and we read them the books that have the big colorful pictures, and the one word, and when those books instruct them of right and wrong, and good and bad, when it comes to trust and safety, you will see a picture and the word fireman, a picture and a word policeman, and you will always see picture and the word teacher.* In this case, when you look at the evidence that came out, you can say that it was kind of [appellant's] behavior was kind of like that of a wolf among sheep. But you know it is not like that, that is not the best analogy. The better analogy is it is more like a shepherd victimizing the sheep, in the very pasture in which she has learned to graze in.

\* \* \*

[Appellant] was a teacher; he was in a special position. It is the abuse of trust that causes this damage that we see

in the Victim Impact Statement that makes this as serious as it is.

\* \* \*

... I am going to impose sentence, and I want the record to be clear that the sentence that I impose is what I think is appropriate under the facts and circumstances of this case. To the extent that it may be below guidelines or above guidelines is due to the fact that this is the sentence I feel is the appropriate sentence in this case based on the evidence that I have.

(Italicized portion cited by appellant).

Rather than demonstrating a bias against appellant, the second and third passages reiterate the nature of, and reasoning behind, the crime for which appellant was convicted. A prevailing point in the remarks is that a teacher, being a "person who has responsibility for the supervision of a minor," CR § 3–602(b)(1), is treated differently under the law precisely because society expects a school to be "a safe zone," premised on trust, as the sentencing court put it. In stating that appellant "betrayed every citizen in [Howard County], particularly those parents who send off their children everyday," the judge was reiterating the substance of the crime for which appellant was convicted, because the parents of the victim in this case entrusted their child to appellant's supervision. It goes without saying that there was nothing improper about the judge considering the nature of the offense in sentencing appellant after he was found guilty of that offense.

■ Appellant contends that "[n]o one could be left with any understanding other than that [the sentencing judge] perceived himself to be among those parents who 'struggle' each day against predators like [appellant]" and that this appearance was improper. Appellant points to the trial judge's statements about "[p]arents in Howard County" who "struggle," "hope," and "pray" for their children, coupled with the use of the first person plural "we." According to appellant, the sentencing judge thus "injected his own personal life into

sentencing" evincing "impermissible considerations [that] pervaded the sentencing."

In his remarks about "parents in Howard County," the trial judge used the third person plural: "they hope and they pray.... And they send them to school;" the second person plural: "[y]ou send them.... to learn academics, to learn their civics;" and the first person plural: "[w]e send them there expecting them to be safe.... When we raise our children and we read them the books...." These occasional uses of "we" do not convey, as appellant argues, that the judge "perceived himself to be among those parents who 'struggle' each day against predators like [appellant]." Instead, the judge's use of "we," along with "they" and "you," referred to "parents" broadly, or the local community at large, as in "We, the People."

Appellant relies on *Jackson*, 364 Md. 192, 772 A.2d 273, in support of his argument. Appellant's reliance on *Jackson* is misplaced. In *Jackson*, the Court of Appeals vacated the sentence of the appellant, who had been found guilty of assault. *Id.* at 195, 772 A.2d 273. At sentencing, the judge made statements such as "a number of communities in the lovely city of Columbia have attracted a large number of rotten apples. Unfortunately, most of them came from the city. And they live and act like they're living in a ghetto somewhere. And [t]hey weren't invited out here to [behave] like animals." *Id.* at 197, 772 A.2d 273 (emphasis removed) (alterations in original) (footnote omitted). The Court concluded that, in making those comments, the sentencing judge "gave the impression that he based his sentence, at least in part, on something beyond the facts and circumstances of the crime and the background of petitioner—specifically, that the sentencing judge based his sentence, at least in part, on a belief that petitioner was from Baltimore City." *Id.* at 201, 772 A.2d 273. The Court concluded that such consideration was improper because it gave "the impression that the sentence imposed on petitioner by this judge may have been more severe based on the judge's belief that petitioner was from Baltimore City." *Id.*

In contrast to *Jackson,* appellant here makes no allegation that there was a characteristic of, or fact about, appellant that the trial judge impermissibly relied on. Appellant's argument is that the trial judge relied on the fact that he himself is a father, and not that the trial judge relied on an impermissible factor *regarding appellant,* such as appellant's race or origin. *See id.*

Finally, appellant asserts that the trial judge's mention of his own children, including specific reference to his daughter's age, constituted the "judicial equivalent of violating the Golden Rule." Maryland law prohibits the use of the "golden rule" argument, wherein "a litigant asks *the jury* to place themselves in the shoes of the victim, or in which an attorney appeals to *the jury's* own interests." *Lee v. State,* 405 Md. 148, 171, 950 A.2d 125 (2008) (emphasis added) (citation omitted). The role of the sentencing judge, however, is quite distinct from that of a jury:

> "Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations.
>
> * * *
>
> "... A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined."

*Johnson v. State,* 274 Md. 536, 541, 336 A.2d 113 (1975) (quoting *Williams v. New York,* 337 U.S. 241, 246–50, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)) (alterations in original).

Thus, "in considering what is the proper sentence for the convicted individual standing before him, the judge saddled with the responsibility can take into account a wide, largely unlimited, range of factors." *Id.* at 542, 336 A.2d 113. A sentencing judge is, of course, prohibited from relying on bias derived from his or her own personal circumstances in imposing sentence, but a sentencing judge may consider the perspective of the victim, the community, and other factors,

including " 'any personal knowledge the judge may have gained from living in the same community as the offender.' " *Jennings*, 339 Md. at 685, 664 A.2d 903 (quoting *Johnson*, 274 Md. at 540, 336 A.2d 113). Therefore, we conclude that, to the limited extent that the prohibition on a "golden rule" argument is applicable to a sentencing judge, the trial judge in the instant case did not improperly rely on a "golden rule" argument.

Our review of the entirety of the trial judge's remarks in the instant case leads us to the conclusion that the judge neither considered an improper factor nor gave the impression that he was relying on an improper factor.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**